Karen FINLEY, John Fleck, Holly Hughes, Tim Miller and National Association of Artists' Organizations, Plaintiffs,

v.

NATIONAL ENDOWMENT FOR THE ARTS; and John E. Frohnmayer, in his official capacity as Chairperson National Endowment for the Arts, Defendants.

No. CV 90–5236 AWT.

United States District Court,
C.D. California.

June 9, 1992.

David Cole, Center for Constitutional Rights; Mary Dorman, Nat. Campaign For Freedom of Expression; Marjorie Heins, American Civ. Liberties Union Foundation, New York City; Paul L. Hoffman, Carol A. Sobel, Jon W. Davidson, ACLU Foundation of Southern California, Los Angeles, Cal.; Nan D. Hunter, American Civ. Liberties Union Foundation, Brooklyn, N.Y.; and Ellen Yaroshefsky, Cardozo Law Clinic, New York City, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Theodore C. Hirt, Mark W. Batten, Dept. of Justice, Washington, D.C., and Lourdes G. Baird, U.S. Atty., and Stan Blumenfeld, Asst. U.S. Atty., Los Angeles, Cal., for defendants.

Gloria C. Phares, Sabrina E. Silverberg, Weil, Gotshal & Manges, New York City, and Ronald D. Reynolds, and Rita L. Tuzon, Hill Wynne Troop & Meisinger, Los Angeles, Cal., for amici curiae Claes Oldenburg, Hans Haacke, Coosje van Bruggen, Nancy Spero, Leon Golub, Andres Serrano, Robert Colescott, Luis Cruz Azaceta, Barbara Kruger, David Hammons, Adrian Piper, Susan Rothenberg and Bruce Nauman.

. Leon Friedman and Edward De Grazia, Cardozo Law School, New York City, for amicus curiae PEN American Center.

Barbara Hoffman, New York City and Stephen F. Rohde, Los Angeles, Cal., for amici curiae PEN American Center and College Art Ass'n.

## MEMORANDUM OPINION

TASHIMA, District Judge.

Plaintiffs are four individual performance artists ("individual plaintiffs") and the National Association of Artists' Organizations ("NAAO"). Individual plaintiffs allege that defendants the National Endowment for the Arts ("NEA") and John E. Frohnmayer ("Frohnmayer"),[1] NEA Chairperson, violated their constitutional and statutory rights by improperly denying their applications for NEA grants and by releasing to the public information from their application files. They seek declaratory and injunctive relief on their constitutional and statutory funding claims, and damages on the Privacy Act claim. In addition, all plaintiffs seek a declaration that the so-called "decency clause" of 20 U.S.C. § 954(d), enacted several months after individual plaintiffs' applications were denied, is void for vagueness and violates the First Amendment on its face.

Before the court are two motions. The first is defendants' motion for judgment on the pleadings. Defendants contend that: (1) the NEA's funding decisions are unreviewable because they are committed to agency discretion by law; (2) venue is improper as to the Privacy Act claim; and (3) plaintiffs lack standing to challenge the facial validity of the "decency clause" because they cannot establish the necessary injury.

Plaintiffs, in turn, have moved for summary judgment on their facial challenge to the "decency clause."

## I. BACKGROUND

### A. *Statutory framework*

The NEA was created by Congress in 1965 as part of the National Foundation on the Arts and the Humanities (the "Foundation"). In establishing the Foundation, Congress found that "it is necessary and appropriate for the federal government to help create and sustain not only a climate encouraging freedom of thought, imagination and inquiry but also the material conditions facilitating the release of ... creative talent." 20 U.S.C. § 952(5).[2] It was the intent of Congress to encourage "free inquiry and expression," and to insure that "conformity for its own sake is not to be encouraged" and that "no undue preference should be given to any particular style or school of thought or expression." 111 Cong.Rec. 13,108 (1965).

. One of three components of the Foundation, the NEA is authorized to administer a program of grants-in-aid to individuals of exceptional talent engaged in or concerned with the arts. 20 U.S.C. § 954(c). The NEA acts through its Chairperson and a 26–member National Council on the Arts (the "Council"), all of whom are appointed by the President, by and with the advice and consent of the Senate. 20 U.S.C. § 954(b)(1) & § 955(b). The Chairperson is the ultimate decision maker; however, the Chairperson is prohibited from approving or disapproving any grant application until

---

**1.** Frohnmayer resigned as Chairperson of the NEA after this action was commenced. No successor has been appointed. Anne–Imelda Radice is the acting Chairperson.

**2.** The Arts, Humanities, and Museums Amendments of 1990 (the "1990 Amendments"), Pub.L. No. 101–512, § 101, 104 Stat. 1961, made a minor grammatical change in and redesignated this clause as subsection (7). *See* 20 U.S.C. § 952(7). Because the funding denials occurred prior to the 1990 Amendments, citations are to the pre-amendment version of the statute, except where otherwise indicated.

he or she has received the recommendation of the Council on such application.[3] 20 U.S.C. § 955(f). The Council, in turn, is required to meet at the call of the Chairperson, and 14 members of the Council constitute a quorum. 20 U.S.C. § 955(d). The Chairperson is also authorized to utilize panels of experts to review funding applications. 20 U.S.C. § 959(a)(4).[4]

On November 5, 1990, approximately four months after individual plaintiffs' applications were denied, in the 1990 Amendments, Congress amended the NEA's governing statute in several respects. Among the changes was the addition of a provision requiring that "general standards of decency and respect for the diverse beliefs and values of the American public" be taken into consideration in making funding determinations. 1990 Amendments, Pub.L. No. 101–512, § 103(b), 104 Stat. 1963, codified at 20 U.S.C. § 954(d).

### B. *Political context of the denials*

At least since 1989 and continuing through to the present, the NEA has been the target of congressional critics and private interest groups for funding works, *inter alia*, that express women's anger over male dominance in the realm of sexuality or which endorse equal legitimacy for homosexual and heterosexual practices.[5] For example, in the Spring of 1989, con- gressional critics assailed the NEA for funding two controversial projects: a photography exhibit by Robert Mapplethorpe, which included homoerotic images, and an exhibit by Andres Serrano[6] entitled "Piss Christ," which was criticized as sacrilegious. *E.g.*, 135 Cong.Rec. S5594 (daily ed. May 18, 1989) (statement of Sen. D'Amato); 135 Cong.Rec. S5805 (daily ed. May 31, 1989) (statement of Sen. Gorton). These two exhibits were frequently cited by members of Congress in debates during the Summer of 1989 over budget allocations for the NEA. *E.g.*, 135 Cong.Rec. H3637, H3640 (daily ed. Jul. 12, 1989) (statements of Reps. Rohrabacher and Dannemeyer).

These funding debates were followed by a series of demands by certain members of Congress for information on NEA-funded artists whose work addressed political and sexual issues. In one instance, a senator requested that the General Accounting Office investigate apparent violations of § 304 of the FY 1990 NEA appropriations bill.[7] The senator listed among such "apparent violations" three literature fellowships awarded to lesbian writers who address issues of sexuality in their work; two art exhibits, one of which incorporated images depicting homosexuality and the other of which included depictions of genital or-

---

3. In the case of an application involving $30,000, or less, the Chairperson may approve or disapprove such request without first receiving the recommendation of the Council if such action is taken pursuant to the terms of a delegation of authority from the Council to the Chairperson, and each such action is reviewed by the Council. 20 U.S.C. § 955(f).

4. The 1990 Amendments made mandatory the Chairperson's use of advisory panels to review funding applications. *See* 20 U.S.C. § 959(c).

5. The facts in this section are drawn from the complaint, which must be taken as true for purposes of defendants' motion for judgment on the pleadings. *See, e.g., General Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir.1989), *cert. denied*, 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990).

6. Serrano is one of the many *amici curiae* in this case.

7. That section provided, in part:

 None of the funds authorized to be appropriated for the National Endowment for the Arts or the National Endowment for the Humanities may be used to promote, disseminate, or produce materials which in the judgment of the National Endowment for the Arts or the National Endowment for the Humanities may be considered obscene, including but not limited to, depictions of sadomasochism, homoeroticism, the sexual exploitation of children, or individuals engaged in sex acts and which, when taken as a whole, do not have serious literary, artistic, political, or scientific value.

 Department of the Interior and Related Agencies Appropriations Act, 1990, Pub.L. No. 101–121, § 304(a), 103 Stat. 701, 741. The NEA's administration of § 304 was struck down in *Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F.Supp. 774 (C.D.Cal.1991).

gans; and appearances by plaintiff Finley at two NEA-funded theaters.[8]

In addition, private special interest groups ran advertisements and circulated flyers condemning NEA funding of sexually-related works and in one case called for defunding of the NEA. In response to criticism by the American Family Association of one art exhibit, Frohnmayer wrote in April 1990 that its images "were disgusting and offensive to me, and undoubtedly to a large majority of the population. I would hope that with the procedures I am implementing at the arts endowment, images such as these would not again be funded."

### C. Denial of plaintiffs' applications and violations of the Privacy Act

In the midst of this political maelstrom, individual plaintiffs each applied for funding under the Performance Artists Program. These applications were among the 90 applications reviewed by the Performance Artists Program Peer Review Panel (the "Panel"). The Panel unanimously recommended that the individual plaintiffs' applications be funded, along with 14 others in that category.[9]

In early May 1990, Frohnmayer asked the Panel to reconsider three of its recommendations, those for plaintiffs Fleck, Hughes and Miller. He stated that reconsideration of Finley's application was unnecessary because two of his close friends had attended a Finley show and had reported to him that it was not obscene. He arranged for an extraordinary Panel meeting by teleconference, in which he personally participated. After reconsidering the three grants, the Panel again unanimously recommended them for funding.

Shortly before the Council met to review recommended NEA grants and fellowships, a syndicated column published in Washington, D.C., reported that plaintiff Finley had been recommended to receive a grant and criticized the content of her work. The article contained a quotation from Finley's funding application, which the NEA admittedly released to the press. The column also stated that Frohnmayer had been "advised" by "friends" of the NEA to veto several grants, including Finley's, to "ease President Bush's deepening troubles with conservatives on his suspect cultural agenda."

Although the Council convened in May and acted on other categories of recommended grants, it deferred consideration of the Performance Artists Program fellowships until its August meeting, pending receipt of further information. In June 1990, Frohnmayer polled members of the Council by individual telephone calls regarding the Performance Artists Program fellowships. On June 28, 1990, the NEA advised individual plaintiffs that their applications had been denied.

Subsequent to these denials, a number of newspaper articles published references to or direct quotations from plaintiffs' NEA application files. A number of these articles cite the NEA as the source of this information. None of the individual plaintiffs consented to any of these disclosures.

### D. Plaintiffs' claims

Following notification that their applications had been denied, plaintiffs filed this action. Individual plaintiffs assert that defendants violated their First Amendment rights by denying their applications on impermissible political grounds and by failing to adhere to procedural safeguards mandated by the First Amendment. They also allege that defendants violated their statutory rights under the National Foundation on the Arts and the Humanities Act of 1965, as amended, 20 U.S.C. § 954–55, by (a) basing the denials on criteria other than

---

**8.** The general counsel of the NEA, Julianne Ross Davis, sent a number of explanatory letters to Henry Wray, Senior Associate General Counsel, General Accounting Office, on this subject. The summary judgment record contains six such letters, dated Apr. 3, May 2, 9, 24 & 30, and Jul. 5, 1990.

**9.** As a matter of practice and custom, recommendation by a peer review panel has been tantamount to the granting of an application.

those set forth by statute, and (b) failing to follow the procedures mandated by statute. Individual plaintiffs also allege that defendants violated their rights under the Privacy Act, 5 U.S.C. § 552a, by violating the confidentiality of their grant applications.

After Congress amended 20 U.S.C. § 954(d) to require that "general standards of decency" be taken into account in evaluating funding applications, the NAAO joined individual plaintiffs in filing an amended complaint, challenging this new provision on Fifth Amendment vagueness and First Amendment grounds.

## II. DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [10]

### A. *First Amendment claims*

The amended complaint alleges that defendants injured plaintiffs' First Amendment interests by denying their applications because of the content of their past artistic expression and by failing to provide a written statement of reasons for the denial.

#### 1. Content-based funding denial

■ Defendants argue that the denial of plaintiffs' grant applications does not constitute injury to plaintiffs' First Amendment interests because the denial is merely a refusal to subsidize plaintiffs' expressive activities—not a barrier to their exercise. However, it is well-established that

> even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized

and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* [357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)]. Such interference with constitutional rights is impermissible.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). The Supreme Court recently reaffirmed this rule in *Rust v. Sullivan,* — U.S. —, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). There the Court stated that the government creates an "unconstitutional condition" when it

> place[s] a condition on the *recipient* of the subsidy rather than on the particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.

*Id.* 111 S.Ct. at 1774 (emphasis in original).

Defendants correctly argue that denial of a benefit imposes an unconstitutional condition only when the benefit is conditioned on the recipient's surrender of (or is imposed as a penalty for) constitutionally protected activity *distinct* from that to be funded by the subsidy. *See Rust, id.* (no unconstitutional condition imposed where grant recipients remain free to engage in abortion-related speech with non-grant funds); *compare Perry v. Sindermann,* 408 U.S. at 597, 92 S.Ct. at 2697 (termination of state university employee because he criticized the university's regents constitutes an unconstitutional condition). However, defendants' contention that the present case does not fall within this proscription is simply wrong.

The amended complaint alleges that plaintiffs applied for funding in a category designed to underwrite performers' professional growth and development, rather than to fund a specific work or project. Thus, the decision not to grant an application in this category cannot be categorized

---

**10.** Judgment on the pleadings is proper when the moving party clearly establishes on the face of the complaint, accepting its allegations as true, that it is entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard*

*Feiner & Co.,* 896 F.2d 1542, 1550 (9th Cir.1990). All inferences reasonably drawn from these facts must be construed in favor of the responding party. *General Conference Corp. of Seventh-Day Adventists,* 887 F.2d at 230.

as a refusal to "subsidize" particular speech because the content of the expression generated through the grants cannot be known in advance. In addition, individual plaintiffs' allege that Frohnmayer requested that the Panel reconsider only three of the four applications, because "two of his close friends had attended a Karen Finley show and had reported to him that it was not obscene." This makes clear that plaintiffs complain that their applications were denied based on the content of their past performances, constituting in effect a penalty for past speech. As such, these allegations are sufficient to state a claims under the First Amendment. *Perry, id.* at 598, 92 S.Ct. at 2698. Defendants are not entitled to judgment on the pleadings on this claim.

### 2. Procedural Safeguards

■ Individual plaintiffs assert that the procedure used to deny their applications violates the First Amendment because defendants failed to set forth in detail and in writing a statement of reasons for the denials.

In support of this claim, plaintiffs cite *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), in which the Court imposed a procedural requirement on the government where the government acts to impose a prior restraint. The Court there held that the government may impose a prior restraint on a speaker consistent with the First Amendment only if the government initiates and obtains prompt judicial review in which it bears the burden of establishing that the expression is unprotected. *Id.* at 560, 95 S.Ct. at 1247.

*Southeastern Promotions* does not provide support for the imposition of the procedural requirements requested by plaintiffs in this case. Because it is unsupported by any authority, plaintiffs' claim that defendants failed to provide them with a written statement of reasons for the denials does not state a claim under the First Amendment.

### B. *Statutory claims*

In the Third and Fourth claims, individual plaintiffs allege that defendants violated the NEA's governing statutes and the Administrative Procedure Act ("APA") by (1) relying on political criteria not set forth in 20 U.S.C. § 954(c), and (2) by failing to comply with the statutory procedures mandated by 20 U.S.C. § 955. Defendants move to dismiss these claims on the grounds that funding decisions are unreviewable as actions committed to agency discretion, and that the procedure alleged in the amended complaint complies with statutory requirements.

### 1. Reviewability

■ The APA provides for judicial review of final agency action. 5 U.S.C. § 704. However, § 704 does not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). The Supreme Court has held that § 701(a)(2)

> is a very narrow exception. [ ] The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply."

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (citation and footnote omitted); *Heckler v. Chaney,* 470 U.S. at 830, 105 S.Ct. at 1655. In other words, "in order for § 701(a)(2) to apply, the matter must be one that a court cannot review even to determine whether the agency, exceeding the scope of its broad power, acted *unlawfully.*" *NAACP v. Secretary of Hous. & Urban Dev.,* 817 F.2d 149, 157 (1st Cir.1987) (emphasis in original).

The version of 20 U.S.C. § 954(c) in effect at the time plaintiffs' applications were denied provided that:

> The Chairperson, with the advice of the National Council on the Arts, is authorized to establish and carry out a program of contracts with, or grants-in-aid or loans to, groups or, in appropriate cases, individuals of exceptional talent

engaged in or concerned with the arts, for the purpose of enabling them to provide or support

(1) projects and productions which have substantial artistic and cultural diversity and the maintenance and encouragement of professional excellence;

(2) projects and productions meeting professional standards or standards of authenticity, irrespective of origin, which are of significant merit and which, without such assistance, would otherwise be unavailable to our citizens for geographic or economic reasons;

(3) projects and productions that will encourage and assist artists and enable them to achieve wider distribution of their works, to work in residence at an educational or cultural institution, or to achieve standards of professional excellence;

(4) projects and productions which have substantial artistic and cultural significance and that reach, or reflect the culture of, a minority, inner city, rural, or tribal community;

(5) projects and productions that will encourage public knowledge, understanding, and appreciation of the arts;

(6) workshops that will encourage and develop the appreciation and enjoyment of the arts by our citizens;

(7) programs for the arts at the local level; and

(8) other relevant projects, including surveys, research, planning, and publications relating to the purposes of this subsection.

These criteria are sufficient to constitute "law to apply" in this case. For example, it is clear that the NEA would exceed its statutory authority if it were to allocate funds based solely on financial need or the ethnicity of the applicant, with no regard to the criteria listed in the statute. Thus, although the statute does confer the NEA with discretion to select grant recipients, that discretion is not boundless. As the limitations of § 954(c) constitute "law to be

applied," the § 701(a)(2) exemption for action "committed to agency discretion" is inapplicable. *See NAACP*, 817 F.2d at 158.

■ The amended complaint alleges that despite the Panel's unanimous recommendation that individual plaintiffs be awarded fellowships as "individuals of exceptional talent," Frohnmayer denied those fellowships for political reasons, *i.e.*, to appease congressional critics. Political expediency is neither an expressed nor implied criterion under the statute for the denial of an NEA grant. Plaintiffs' allegations are sufficient to state a claim under § 954(c) and the APA.

### 2. *Procedural violation*

■ Individual plaintiffs also allege that Frohnmayer's poll of individual Council members for their respective recommendations in the Solo Performance Theatre category violated the procedure mandated by the statute.

Under 20 U.S.C. § 955(f), the Chairperson may not award or deny a grant "until the Chairperson has received the recommendation of the Council on such application." In addition, 20 U.S.C. § 955(d) provides that, "The Council shall meet at the call of the Chairperson but not less often than twice during each calendar year. Fourteen members of the Council shall constitute a quorum." [11]

Plaintiffs contend that these two provisions, read together, clearly indicate that Congress intended that the Council should act as a collegial body in making recommendations to the Chairperson. In response, defendants argue that the statute contains no requirement "that Council members be collected in a single room or on a single telephone conference call when they convey their recommendation" and insist that this interpretation of the statute is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

**11.** This section was amended by the 1990 Amendments to add reporting and record-keeping requirements, but the language quoted in the text remains intact. *See* Pub.L. No. 101–512, § 106, 104 Stat. 1968.

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. *First, always, is the question whether Congress has directly spoken to the precise question at issue.* If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[ ] If however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute,[ ] as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.[ ]

*Id.* at 842–43, 104 S.Ct. at 2781–82 (emphasis added; footnotes omitted).

In this case, congressional intent is clear from the statute itself. First, the use of the words "the Council" rather than "Council *members* " indicates that Congress intended the Council to act as a body, not an aggregation of individuals, when making recommendations to the Chairperson. Second, the statute provides that the Chairperson may not act on applications until he or she "has received *the* recommendation of the Council." (Emphasis added.) The use of the definite article "the," together with the singular noun "recommendation," indicate an intent that the Council will arrive at a single, collective recommendation. A contrary intent would be expressed with language such as "the recommendations of Council members."

Further, if Congress intended that Council members act individually, and not collegially, in fulfilling their obligation, there would have been no need to establish the quorum requirement of § 955(d). Defendants' construction of the statute renders the quorum requirement superfluous.

Because congressional intent is clear, the court need not (indeed may not) reach the second question of whether the NEA's construction is permissible.

The APA authorizes the court to set aside agency action taken in violation of statutory procedures. 5 U.S.C. § 706(2)(D). Thus, these allegations are sufficient to state a claim upon which relief may be granted.

### C. *Privacy Act claim*

Individual plaintiffs also allege that the NEA staff released information to the public from their application files in violation of the Privacy Act, 5 U.S.C. § 552a. Defendants acknowledge that the NEA was the source of these "leaks," but challenge this claim on the grounds that (1) venue is defective as to two plaintiffs, (2) the Freedom of Information Act ("FOIA") required disclosure of the subject information and therefore immunizes defendants against liability under the Privacy Act, and (3) the information disclosed was already a matter of public record and therefore is not protected by the Privacy Act.

#### 1. Venue

 Defendants argue that venue is improper in this district under the Privacy Act's venue provision, 5 U.S.C. § 552a(g)(5), as to two individual plaintiffs, Finley and Hughes, because they do not reside or have their principal places of business in this district. The venue statute provides:

An action to enforce any liability created under this section may be brought in the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, without regard to the amount in controversy.

5 U.S.C. § 552a(g)(5).

Relying on cases construing the general venue statute of 28 U.S.C. § 1391(e),[12] ap-

---

**12.** Title 28 U.S.C. § 1391(e) provides in relevant part that a civil action in which a defendant is

the United States, or an officer, employee or agency thereof,

plicable to actions in which the United States is a defendant, plaintiffs argue that venue is proper in this district as to all plaintiffs because venue is proper as to two of them. *See Exxon Corp. v. FTC,* 588 F.2d 895, 899 (3d Cir.1978) (venue proper under § 1391(e) where at least one plaintiff resides in the forum district); *National Air Traffic Controllers Ass'n v. Burnley,* 700 F.Supp. 1043, 1045 (N.D.Cal.1988) (same).

Defendants seek to distinguish these cases by arguing that the general venue statute is broader than the Privacy Act venue provision. While 28 U.S.C. § 1391(e) provides a different set of venue possibilities than is provided in 5 U.S.C. § 552a(g)(5), whether or not the former can be said to be more liberal than the latter misses the point. The reasoning of *Exxon Corp.* is equally applicable to the Privacy Act venue provision: "requiring every plaintiff in an action against the federal government or an agent thereof to independently meet [the statutory venue] standards would result in an unnecessary multiplicity of litigation" and "[t]he language of the statute itself mandates no such narrow construction." *Exxon Corp.,* 588 F.2d at 898–99.

The court holds that in a multi-plaintiff Privacy Act action, if any plaintiff satisfies the venue requirement of 5 U.S.C. § 552a(g)(5), the venue requirement is satisfied as to the remaining plaintiffs. Because the statutory venue requirement is satisfied as to the Privacy Act claims of two plaintiffs, venue is proper as to all four individual plaintiffs.

### 2. The FOIA defense

 Next, defendants argue that the release of information from individual plaintiffs' files is not actionable under the Privacy Act because release is *required* by FOIA.

may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action.

The relevant portion of the Privacy Act provides:

No agency shall disclose any record which is contained in a system of records by any means of communication to any other person, or to another agency, except pursuant to a written request by, or with the prior consent of, the individual to whom the record pertains, unless disclosure of the record would be—

. . . . .

(2) required under [FOIA,] section 552 of this title.

5 U.S.C. § 552a(b)(2).[13] FOIA, in turn, contains an internal privacy act of sorts that exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" from its disclosure requirements. 5 U.S.C. § 552(b)(6) (the "(b)(6) exemption").

The Supreme Court has construed the (b)(6) exemption broadly to "cover detailed Government records on an individual which can be identified as applying to that individual." *United States Dep't of State v. Washington Post Co.,* 456 U.S. 595, 602, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982).

When disclosure of information which applies to a particular individual is sought from Government records, courts must determine whether release of the information would constitute a clearly unwarranted invasion of that person's privacy.

*Id.* In *Washington Post* the Court held that a newspaper's request for "documents indicating whether [two individuals] ... hold valid U.S. passports" was information "contained in personnel, medical or *similar* files" and therefore subject to the balancing test required by the (b)(6) exemption. *Id.* at 596, 598, 102 S.Ct. at 1959,

**13.** There is no dispute that NEA is an "agency" subject to this provision, or that the information released constitutes a "record which is contained in a system of records" within the meaning of this section.

1960 (emphasis added).[14]

The amended complaint alleges that the NEA released information from individual plaintiffs' application files. Such information clearly "applies to [each of the] particular individual[s]" to which it corresponds, and thus may not be released under FOIA without consideration of the competing interests in personal privacy and public benefit.

#### 3. Publicly available information

■ Finally, defendants argue that the information released was already publicly available; therefore, that disclosure cannot violate the Privacy Act. *See King v. Califano,* 471 F.Supp. 180, 181 (D.D.C.1979) (officials who informed press that an Administrative Law Judge was removed due to severe mental and emotional problems did not "disclose" the information within the meaning of the privacy act because that information was "publicly known prior to ... publication"). However, case law in this Circuit is contra. *See Covert v. Herrington,* 667 F.Supp. 730, 739 (E.D.Wash. 1987) (information obtained from public sources and then released to an outside agency constitutes "disclosure" within the meaning of the Privacy Act), *aff'd,* 876 F.2d 751 (9th Cir.1989); *see also United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 753, 780, 109 S.Ct. 1468, 1471, 1485, 103 L.Ed.2d 774 (1989) (recognizing a categorical exemption under FOIA for private citizen "rap sheets," although the data are compiled from publicly available documents).

Thus, even if it were clear from the face of the amended complaint that the information released was already a matter of public record, in this Circuit, the allegations state a claim for relief under the Privacy Act.

### III. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

All plaintiffs move for summary judgment on the Sixth Claim, which alleges that the "decency clause" is impermissibly vague under the Fifth Amendment Due Process Clause and violates the First Amendment on its face. In opposition, defendants argue that (1) all plaintiffs lack standing to challenge this provision; (2) the vagueness challenge fails on the merits because the NEA has implemented a limiting construction of the clause that cures any ambiguity; and (3) as construed by the agency, the provision does not injure any artist's First Amendment interests.

#### A. *Standing*

■ Defendants first argue that plaintiffs do not have standing to challenge § 954(d) because (1) allegations of "chill alone" cannot support standing and (2) plaintiffs cannot demonstrate any threatened or actual injury from the challenged provision.

To establish standing, a plaintiff must show that (1) "he personally has suffered some actual or threatened injury" as a result of defendants' actions; (2) the injury "fairly can be traced to the challenged action"; and (3) the injury is "likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

Citing *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972), defendants contend that plaintiffs' allegation of a "chilling effect" is insuffi-

---

**14.** In support of their position, defendants cite *Kurzon v. Department of Health and Human Serv.,* 649 F.2d 65 (1st Cir.1981), in which plaintiff sought to compel disclosure under FOIA of the names and addresses of unsuccessful research grant applicants. Reversing summary judgment for defendant, the court rejected defendant's argument that such information was subject to FOIA's exemption for "personnel and medical files and similar files." The court reasoned that the (b)(6) exemption "was intended to shield against a variety of embarrassing disclosures ... 'of the same magnitude—as highly personal or as intimate in nature—as that at stake in personnel and medical records.'" *Id.* at 68, *quoting Board of Trade v. CFTC,* 627 F.2d 392, 398 (D.C.Cir.1980). However, in *Washington Post* the Supreme Court explicitly rejected *Board of Trade,* the case on which *Kurzon* relied. *See Washington Post,* 456 U.S. at 598, 102 S.Ct. at 1959.

cient to establish the required "actual or threatened injury" under the *Valley Forge* test. In *Laird,* a group of citizens sued to enjoin an Army program that gathered and stored information about protest marches and demonstrations. The Court found that *Laird* plaintiffs lacked standing because they had simply read about the Army program in the newspaper and could not explain "the precise connection between the mere existence of the challenged system and their alleged chill." *Id.* at 13 n. 7, 92 S.Ct. at 2325 n. 7.

Individual plaintiffs argue that *Laird* is factually distinguishable because all individual plaintiffs here have, in the past, been denied grants based on the controversial content of their expression. Also, individual plaintiffs Hughes and Miller applied for and were awarded NEA grants in 1991 under the new standard. Hughes claims that, as a result of the "decency" standard, she believed it necessary to defend her work against charges of indecency and addressed this issue in her funding application rather than elaborating on her work and its goals. Both Hughes and Miller claim that the existence of the "decency" provision circumscribes their artistic freedom because they fear stepping across an invisible line of "decency" which would result in forfeiture of some or all of their 1991 grants and disqualification for future grants.[15]

Plaintiffs contend that these facts are analogous to those presented in *Socialist Workers Party v. Attorney General,* 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (Marshall, Circuit Justice, 1974). There, Justice Marshall refused to stay the reversal of an injunction barring the government from conducting surveillance at a youth

organization conference. He first found that the plaintiffs had standing to maintain the action. Distinguishing *Laird,* he held:

In this case, the allegations are much more specific: the applicants have complained that the challenged investigative activity will have the concrete effects of dissuading some YSA delegates from participating actively in the convention and leading to possible loss of employment for those who are identified as being in attendance. Whether the claimed "chill" is substantial or not is still subject to question. The specificity of the injury claimed by the applicants is sufficient, under *Laird,* to satisfy the requirements of Article III.

*Id.* at 1319, 95 S.Ct. at 428.

At a minimum, plaintiffs Hughes and Miller, who have applied for and received funding under the new statute, have standing because they risk forfeiting their grants if they engage in behavior determined by the NEA to be in contravention of the decency provision. These plaintiffs face threatened and actual harm because, in order to retain their grants and to ensure that they are considered for future grants, they must now restrict their expressive conduct, which is otherwise protected by the First Amendment.

The standing of individual plaintiffs Finley and Fleck, who did not apply for grants, is less clear because they allege only that they have forgone their application opportunity out of "fear" that they would be denied funding. However, as Hughes and Miller have met the "injury" prong, it is unnecessary to the resolution of the substantive claim that the court determine the standing of the remaining individual plaintiffs. *See Arlington Heights v.*

---

**15.** Applicants are required as part of the application process to submit an assurance that their projects or productions "will meet the standards of artistic excellence and artistic merit required by this subchapter." 20 U.S.C. § 954(i)(4). That standard now includes a consideration of "general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). In addition, recipients are required to file an interim report that includes a description of her or his compliance with "the subchapter" (which includes the

"decency" standard). 20 U.S.C. § 954(i)(3)(A)(ii).

Grant funds are distributed in installments, and payments may be suspended if the Chairperson determines that the recipient is not in compliance with § 954 or any other conditions of the grant. 20 U.S.C. § 954(j). In addition, failure to satisfy the purposes for which the assistance was provided may be taken into account in determining whether to provide any subsequent financial assistance. 20 U.S.C. § 959(f)(3)(A).

*Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977).

■ In addition, the NAAO has standing both on its own behalf and as a representative of its members who have applied for grants. First, NAAO's expenditure of resources to advocate against the decency standard and to assist its members in responding to the standard creates a cognizable injury to that organization. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982) (alleging injury to organization's activities and consequent drain on its resources satisfies injury requirement for organization to assert standing in its own right); *see also El Rescate Legal Serv., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir.1992) (accord); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.) ("organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action"), *cert. denied*, — U.S. —, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990).

Moreover, NAAO satisfies the requirements for representative standing based on injury to its members. First, the Director of the NAAO reports that, like Hughes and Miller, some members have received NEA grants under the new standards, but are "chilled" in the scope of their work and their applications by uncertainty as to how to comply with the decency clause. Second, this suit seeks to protect freedom of artistic expression, an interest germane to NAAO's organizational purpose. Lastly, neither this claim nor the requested relief requires the individual participation of NAAO members. *See International Union, UAW v. Brock*, 477 U.S. 274, 282, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986) (listing requirements for representative organizational standing).

**B. *Statutory Construction***

■ Because the court must avoid deciding a constitutional issue if possible, it is first necessary to determine whether § 954(d)(1), as amended, can be construed to avoid conflict with constitutional proscriptions.

Defendants advance two possible constructions of the statute which they contend avoid constitutional infirmity. Defendants contend (1) that the decency provision does "not impose content restrictions on NEA grant decisions," but "merely implements a method for selecting review panel members" and, alternatively, (2) that "decency" and "respect ... are factors only to the extent that they are implicit in the assessment of artistic merit."

Again, under *Chevron*, the initial question is whether congressional intent on the issue is clear. Section 954(d), as amended in 1990, provides that

artistic excellence and artistic merit are the criteria by which applications are judged, *taking into consideration* general standards of decency and respect for the diverse beliefs and values of the American public.

20 U.S.C. § 954(d)(1) (emphasis added). The plain language of the statute requires that "general standards of decency and respect for the diverse beliefs and values of the American public" be "tak[en] into consideration" in judging applications.[16]

Thus, it is clear from the language of the statute that "decency" and "respect" for diverse beliefs *are* factors to be considered in determining "artistic merit," and therefore eligibility for funding.

Even had the statute itself not been clear, neither of defendants' constructions is entitled to deference because both are "manifestly contrary to congressional intent." *See Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782; *Railway Labor Executives'*

---

**16.** In addition to this plain language, the plethora of comments in the Congressional Record indicates that the "decency" provision was intended to act as a bar to funding controversial projects or artists. *See, e.g.,* 136 Cong.Rec. H9410–57 (daily ed. Oct. 11, 1990) (statements by members of Congress explaining that the "decency" provision would preclude funding of works such as Andres Serrano's "Piss Christ" and others that would "deeply offend the sensibilities of significant portions of the public").

*Ass'n v. ICC,* 958 F.2d 252, 256 (9th Cir. 1992) (where congressional intent is ambiguous, the agency's construction controls "unless it is 'arbitrary, capricious or manifestly contrary to the statute' ").

First, a construction that this clause "merely implements a method for selecting review panel members" cannot be given effect for it would render 20 U.S.C. § 959(c), as amended by the same act that added the "decency" provision, superfluous.[17] *See Freytag v. Commissioner,* — U.S. —, 111 S.Ct. 2631, 2638, 115 L.Ed.2d 764 (1991) ("Our cases consistently have expressed 'a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment' "). Because § 959(c) requires that the composition of Peer Review Panels reflect "wide geographic, ethnic, and minority representation as well as ... diverse artistic and cultural points of view," a construction of the decency provision as requiring only the diversification of panel membership would render the "decency" clause of § 954(d) without legal content.

Second, defendants' alternative construction (*i.e.,* that "decency" and "respect" are factors only to the extent that they are implicit in the assessment of artistic merit) is also manifestly contrary to congressional intent. It defies logic to argue that explicit additions to the "artistic merit" standard are merely implicit in the assessment of artistic merit. Had Congress believed that "decency" and "respect for diverse views" were naturally embedded in the concept of "artistic merit," there would be no need to elaborate on that standard.

### C. *Vagueness*

■■■ The Fifth Amendment due process clause requires that a statute be sufficiently clearly defined so as not to cause persons "of common intelligence—necessarily

[to] guess at its meaning and [to] differ as to its application." *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). In the area of expressive conduct, vague laws offend several important values: (1) they may trap the innocent by failure to provide fair warning; (2) they may fail to provide explicit and objective standards and therefore permit arbitrary and discriminatory enforcement; and (3) they may inhibit First Amendment freedoms by forcing individuals to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (internal quotation marks omitted); *Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 512–13 (9th Cir.1988).

■■■ Plaintiffs and amici argue, at length, that the decency provision is vague and should be refused effect under both the First and Fifth Amendments. Citing a number of Supreme Court opinions, they contend that words such as "decency" and "respect" are inherently subjective. *See Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974) ("what is contemptuous to one [person] may be a work of art to another"); *Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) ("one [person]'s vulgarity is another's lyric"). In addition, they point out that such words as "decency" and "respect" are contentless in the context of American society: the very nature of our pluralistic society is that there are an infinite number of values and beliefs, and correlatively, there may be no national "general standards of decency." *See also Bullfrog Films v. Wick,* 646 F.Supp. 492, 505 (C.D.Cal.1986) (finding USIA regulation impermissibly vague because "[h]ow is one to determine what is

---

**17.** 20 U.S.C. § 959(c) now reads in relevant part:

The Chairperson of the National Endowment for the Arts shall utilize advisory panels to review applications, and to make recommendations to the National Council on the Arts ... When reviewing applications, such panels shall recommend applications for projects, productions, and workshops solely

on the basis of artistic excellence and artistic merit. The Chairperson shall issue regulations and establish procedures—

(1) *to ensure that all panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic; and minority representation as well as individuals reflecting diverse artistic and cultural points of view.*

'misrepresentative' of an open, diverse and pluralistic society as is the United States"), *aff'd,* 847 F.2d 502 (9th Cir.1988).

There is no question that persons "of common intelligence must necessarily guess at [the] meaning and differ as to [the] application" of § 954(d). *Connally,* 269 U.S. at 390, 46 S.Ct. at 127. Further, this provision clearly gives rise to each of the three evils identified in *Grayned:* (1) it creates a trap for the unwary applicant who may engage in expression she or he believes to comport with the standard, only to learn upon receiving notice that her or his grant has been withdrawn or a new application denied because she or he has offended someone's subjective understanding of the standard; (2) panelists, the Council, and the Chairperson are given no guidance in administering the standard; each apparently is expected to draw on her or his own personal views of decency or some ephemeral "general American standard of decency;" and (3) it necessarily causes the imposition of self-censorship wider than the line drawn by the statute because the line is, in effect, imperceptible. *See* 408 U.S. at 108–09, 92 S.Ct. at 2299.

As the decency provision fails adequately to notify applicants of what is required of them or to circumscribe NEA discretion, it cannot be given effect consistent with the Fifth Amendment's due process requirement.

## D. *First Amendment*

Plaintiffs also contend that the "decency" clause violates the First Amendment on two grounds. First, they contend that the decency clause constitutes an unconstitutional condition. They argue that because the NEA reviews all of an applicant's prior work in determining whether the application meets that standard. Alternatively, plaintiffs contend that, even if the reach

of the decency clause is limited to work funded by the NEA, public funding of the arts (like public funding in the context of a university or the press) requires government neutrality, a requirement violated by the decency clause.

■■■ The unconstitutional condition theory is easily disposed of for two reasons. First, this theory rests on allegations that NEA appraisal of funding applications includes an evaluation of each applicant's entire body of work—whether NEA-funded or otherwise. However, this is a facial challenge to the statute. On such a challenge, it is inappropriate to consider the manner in which the agency has interpreted and applied the statute.

■■■ Second, in support of this claim, plaintiffs have submitted evidence that the NEA grant-making process includes review of non-NEA funded works in more than one category within the NEA's Theater Program. In response, defendants have adduced evidence that an applicant's past work is considered only in a few limited categories, and even then review is confined to consideration of the titles and dates of the performances. As defendants' evidence creates a material factual dispute, resolution of this issue on summary judgment would be foreclosed even if agency practice were a permissible consideration in this context.[18]

### 1. First Amendment interest in artistic expression funded by the government

■■■ As an alternative theory of First Amendment violation, plaintiffs contend that public subsidization of art, like public funding of the press and university activities, demands government neutrality. In effect, plaintiffs ask the court to recognize a protected First Amendment interest in

---

**18.** An argument can be made that the decency clause constitutes a facially unconstitutional condition with respect to groups, agencies and non-profit organizations that receive NEA funding. Because the NEA is permitted to fund only up to 50% of the total cost of any program or project conducted by a group, agency or non-profit organization, 20 U.S.C. § 954(e) (groups), § 954(p)(3) (agencies and non-profit organizations), any statutory content control over an NEA-supported program or project necessarily imposes restrictions over a substantial proportion of non-NEA-funded expression. However, as the NAAO have not raised this argument, the court does not address or resolve it.

artistic expression funded by the government.

Plaintiffs point out that the Court in *Rust v. Sullivan* cautioned that "funding by the Government, even when coupled with the freedom of the fund recipients to speak outside the scope of the Government-funded project, is [not] invariably sufficient to justify government control over the content of expression." 111 S.Ct. at 1776. The Court cited universities and public fora as two settings in which First Amendment values demand government neutrality notwithstanding that in both contexts the government is merely declining to support speech rather than prohibiting it altogether. *Id.* The Court observed that its prior decisions recognized that

> the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of funds is restricted by the vagueness and overbreadth doctrines of the First Amendment.

*Id.* (citing *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967)).[19]

In *Keyishian*, a case widely-cited in support of academic freedom, the Court observed that

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.... The Nation's future depends on leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather]

than through any kind of authoritative selection."

*Keyishian*, 385 U.S. at 603, 87 S.Ct. at 683.

Artistic expression, no less than academic speech or journalism, is at the core of a democratic society's cultural and political vitality. Congress recognized as much in establishing the NEA. For example, the Senate Report accompanying the NEA's creation devoted an entire section to "Freedom of Expression." It stated, *inter alia*, that:

> It is the intent of the committee that in the administration of this act there be given the fullest attention to freedom of artistic and humanistic expression ... Countless times in history artists and humanists who were vilified by their contemporaries because of their innovations in style or mode of expression have become prophets to a later age.
>
> Therefore, the *committee affirms that the intent of this act should be the encouragement of free inquiry and expression.* The committee wishes to make clear that conformity for its own sake is not to be encouraged, and that no undue preference should be given to any particular style or school of thought or expression ... The standard should be artistic and humanistic excellence.

S.Rep. No. 300, 89th Cong. 1st Sess. 3–4 (1965) (emphasis added).

In addition, the significance of the arts as a "traditional sphere of free expression ... fundamental to the functioning of our society," *Rust*, 111 S.Ct. at 1776, is confirmed by the legislative "Declaration of findings and purposes" that is a part of the NEA's authorizing statute. There, Congress stated, in part, that:

> (3) An advanced civilization must not limit its efforts to science and technology alone, but must give full value and support to the other great branches of scholarly and cultural activity in order to achieve a better understanding of the

**19.** In addition, other recent cases suggest that the press is also an arena in which content controls on subsidies are prohibited. *See, e.g., Leathers v. Medlock*, — U.S. —, 111 S.Ct. 1438, 1443–46, 113 L.Ed.2d 494 (1991) (content-based subsidization of the press through tax exemptions constitutes First Amendment injury); *Arkansas Writers Project, Inc. v. Ragland*, 481 U.S. 221, 229, 107 S.Ct. 1722, 1727, 95 L.Ed.2d 209 (1987) (tax exemption based on content of a publication constitutes First Amendment injury).

past, a better analysis of the present, and a better view of the future.

(4) Democracy demands wisdom and vision in its citizens. It must therefore foster and support a form of education, and access to the arts and the humanities, designed to make people of all backgrounds and wherever located the masters of their technology and not its unthinking servants.

(6) The arts and the humanities reflect the high place accorded by the American people to the nation's rich cultural heritage and to the fostering of mutual respect for the diverse beliefs and values of all persons and groups.

(7) The practice of art and the study of the humanities require constant dedication and devotion. While no government can call a great artist or scholar into existence, it is necessary and appropriate for the Federal Government to help create and sustain not only a climate encouraging freedom of thought, imagination, and inquiry but also the material conditions facilitating the release of this creative talent.

(9) Americans should receive in school, background and preparation in the arts and humanities to enable them to recognize and appreciate the aesthetic dimensions of our lives, the diversity of excellence that comprises our cultural heritage, and artistic and scholarly expression.

(10) It is vital to a democracy to honor and preserve its multicultural artistic heritage as well as support new ideas, and therefore it is essential to provide financial assistance to its artists and the organizations that support their work.

20 U.S.C. § 951.

It is clear from these legislative findings[20] that artistic expression serves many of the same values central to a democratic society and underlying the First Amendment as does scholarly expression in other fields. In addition, as reported by *amicus curiae* College Art Association ("CAA")[21], NEA grants are often made to artists and museums in the university context. For example, the CAA itself has received NEA grants to support its annual conference in past years. Additionally, many of its individual and institutional members have received NEA grants. CAA reports that government support has been critical to the health and well-being of the arts and humanities in American universities.

The close relationship between academic freedom and artistic expression was recently set forth in a statement by participants in a conference sponsored by the American Association of University Professors, the American Council on Education, the Association of Governing Boards of Universities and Colleges, and the Wolf Trap Foundation:

> We believe that "essential as freedom is for the relation and judgment of facts, it is even more indispensable to the imagination." ... Faculty and students engaged in the creation and presentation of works of the visual and the performing arts are engaged in pursuing the mission of the university as much as are those who write, teach, and study in other academic disciplines. Works of the visual and performing arts are important both in their own right and because they can enhance our experience and understanding of social institutions and the human condition. Artistic expression in the classroom, studio and workshop therefore merits the same assurance of academic freedom that is accorded to other scholarly and teaching activities.

*Academic Freedom and Artistic Expression*, Academe at 13 (July–Aug. 1990).

---

20. These findings were reaffirmed by Congress through the revision and republication of this section as part of the 1990 Amendments. *See* Pub.L. No. 101–512, § 101, 104 Stats. 1961–62.

21. The College Art Association is a nationwide, non-profit organization whose members include 2,000 institutions of higher education and museums, in addition to 11,600 individual artists, art historians and museum professionals. It was founded in 1911 both as a learned society and professional organization dedicated to promoting the highest standards of scholarship and teaching in the history and criticism of the visual arts and to foster the highest levels of technical skill in teaching and practices of art.

In response to plaintiffs' position, defendants note that unlike public fora, NEA funding is a limited resource, and argue that the NEA cannot parcel out its limited budget on a purely content-neutral, first-come-first-served basis as governments must do in allocating use of a public forum. Instead, they argue, the agency must select a small percentage of the many applicants based on its subjective judgment of which of the exceptionally talented artists would best promote the statute's objectives.

Defendants misapprehend the substance of plaintiffs' challenge. Plaintiffs do not argue that arts funding is analogous to a public forum or that NEA funds must be allocated on a first-come, first-served basis. Rather, plaintiffs analogize funding for the arts to funding of public universities. In both settings, limited public funds are allocated to support expressive activities, and some content-based decisions are unavoidable. Nonetheless, this fact does not permit the government to impose whatever restrictions it pleases on speech in a public university, nor should it provide such license in the arts funding context. Hiring and promotion decisions based on professional evaluations of academic merit are permissible in a public university setting, but decisions based on vague criteria or intended to suppress unpopular expression are not. *See Dube v. State Univ. of New York,* 900 F.2d 587, 598 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991); *Levin v. Harleston,* 770 F.Supp. 895, 921 (S.D.N.Y.1991); *cf. Keyishian,* 385 U.S. at 605–606, 87 S.Ct. at 685. Analogously, professional evaluations of artistic merit are permissible, but decisions based on the wholly subjective criterion of "decency" are not. *Cf. Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 575–77 (9th Cir.1984) (city may dedicate public forum to certain categories of expression but may not deny access to performers based on their political views or unorthodox manner of expression), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985).

Thus, the fact that the exercise of professional judgment is inescapable in arts funding does not mean that the government has free rein to impose whatever content restrictions it chooses, just as the fact that academic judgment is inescapable in the university does not free public universities of First Amendment scrutiny. The right of artists to challenge conventional wisdom and values is a cornerstone of artistic and academic freedom, no less than the rights of scientists funded by the National Institutes of Health. *See Board of Trustees of Leland Stanford Jr. Univ. v. Sullivan,* 773 F.Supp. 472, 478 (D.D.C.1991). Therefore, the court holds that government funding of the arts is subject to the constraints of the First Amendment.

### 2. First Amendment injury

■ Having concluded that public funding of art is entitled to First Amendment protection, the resolution of plaintiffs' challenge is straightforward.

It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society.

*Broadrick v. Oklahoma,* 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). A statute that suppresses a substantial amount of constitutionally protected expression must be refused effect unless it is subject to a construction that narrows its reach only to unprotected speech. *See Board of Airport Comm'rs v. Jews for Jesus,* 482 U.S. 569, 575–76, 107 S.Ct. 2568, 2573, 96 L.Ed.2d 500 (1987).

The decency clause seeks to suppress speech that is offensive to some in society. It is well-established that

the fact that given speech is thought by many to be highly offensive, either because it espouses political, religious, racial or other doctrines which to many are most abhorrent,[ ] or because of its use of "indecent" words,[ ] does not, absent a showing of likely and imminent antisocial

conduct arising from such speech, constitute a ground for abridging speech.

M.B. Nimmer, *Nimmer on Freedom of Speech* § 2.05[B][1] at 2–30 (1991) (citing *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)).

 The decency clause clearly reaches a substantial amount of protected speech. In *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989), the Supreme Court held that "expression which is indecent but not obscene is protected by the First Amendment...." *See also FCC v. Pacifica Found.,* 438 U.S. 726, 740, 98 S.Ct. 3026, 3035, 57 L.Ed.2d 1073 (1978) ("prurient appeal is an element of the obscene, but the normal definition of 'indecent' merely refers to nonconformance with accepted standards of morality"). The statute seeks to confine the NEA's funding approval only to what is "decent." Conversely, it seeks to dissuade the NEA from funding what is "indecent" When a statute directed at speech is overbroad, as is the decency clause, it gives rise to the hazard that "a substantial loss or impairment of freedoms of expression will occur...." *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965).

The decency clause sweeps within its ambit speech and artistic expression which is protected by the First Amendment. The court, therefore, holds that the decency clause, on its face, violates the First Amendment for overbreadth and cannot be given effect.

## CONCLUSION

For all of the foregoing reasons, the court denies defendants' motion for judgment on the pleadings, except with respect to plaintiffs' Second Claim. Further, the court grants plaintiffs' motion for summary judgment on the Sixth Claim, on the grounds that the "decency" clause of 20 U.S.C. § 954(d)(1), on its face, is void for vagueness under the Fifth Amendment and is overbroad under the First Amendment.

A separate judgment shall be entered on the Sixth Claim, consistent herewith.