100 F.3d 671
 KAREN FINLEY; JOHN FLECK; HOLLY HUGHES; TIM MILLER; NATIONAL ASSOCIATION OF ARTISTS' ORGANIZATIONS, PLAINTIFFS-APPELLEES,
v.
NATIONAL ENDOWMENT FOR THE ARTS; JANE ALEXANDER,* IN HER OFFICIAL CAPACITY AS CHAIRPERSON OF THE NATIONAL ENDOWMENT FOR THE ARTS, DEFENDANTS-APPELLANTS.
KAREN FINLEY; JOHN FLECK; HOLLY HUGHES; TIM MILLER; NATIONAL ASSOCIATION OF ARTISTS' ORGANIZATIONS, PLAINTIFFS-APPELLEES,
V.
NATIONAL ENDOWMENT FOR THE ARTS; JANE ALEXANDER, IN HER OFFICIAL CAPACITY AS CHAIRPERSON OF THE NATIONAL ENDOWMENT FOR THE ARTS, DEFENDANTS-APPELLANTS.
KAREN FINLEY; JOHN FLECK; HOLLY HUGHES; TIM MILLER; NATIONAL ASSOCIATION OF ARTISTS' ORGANIZATIONS, PLAINTIFFS-APPELLEES,
V.
NATIONAL ENDOWMENT FOR THE ARTS; JANE ALEXANDER, IN HER OFFICIAL CAPACITY AS CHAIRPERSON OF THE NATIONAL ENDOWMENT FOR THE ARTS, DEFENDANTS-APPELLANTS.
 No. 92-56028, No. 92-56387, No. 92-55089
 United States Court of Appeals,
Ninth Circuit
 Argued and Submitted February 3, 1994
Decided: November 5, 1996.
 
 Alfred R. Mollin, United States Department of Justice, Washington, D.C., for the defendants-appellants.
 David Cole, Center for Constitutional Rights, New York, New York, for the plaintiffs-appellees.
 Gloria C. Phares and Victoria A. Kummer, Weil, Gotshal & Manges, New York, New York, for the amici curiae.
 Len L. Munsil, Phoenix, Arizona, for the amicus curiae.
 Robert M. O'Neil, Charlottesville, Virginia, for the amici curiae.
 Ann H. Franke, Washington, D.C., for the amici curiae.
 Elliot M. Mincberg and Sonia Bacchus, People for the American Way, Washington, D.C., for the amici curiae.
 Barbara Hoffman, Schwartz, Weiss, Steckler & Hoffman, P.C., on the brief, for Amici Leaned Societies.
 Appeals from the United States District Court for the Central District of California, A. Wallace Tashima, District Judge, Presiding. D.C. Nos. CV-90-5236-AWT, CV-90-5236-AWT and CV-90-5236-AWT.
 Before: James R. Browning, Warren J. Ferguson, and Andrew J. Kleinfeld, Circuit Judges.
 BROWNING, Circuit Judge:
 
 
 1
 Plaintiffs Karen Finley, John Fleck, Holly Hughes, and Tim Miller were refused fellowships under the defendant National Endowment for the Arts' ("NEA") solo performance artists program. They filed suit, alleging, among other things, that a provision of the NEA's governing statute identifying the standard for approval of funding applications violated the Fifth and First Amendments because it was impermissibly vague and imposed content-based restrictions on protected speech. The district court agreed, granted summary judgment to the plaintiffs, and certified its ruling for interlocutory appeal. Finley v. National Endowment for the Arts, 795 F. Supp. 1457 (C.D. Cal. 1992). We affirm, essentially for the reasons stated by the district court.[1]
 
 
 2
 Congress gave the NEA authority "to establish and carry out a program of . . . grants-in-aid . . . to . . . individuals of exceptional talent engaged in or concerned with the arts." 20 U.S.C. 954(c). The Chairperson of the NEA has ultimate authority to approve or disapprove grants. 20 U.S.C. 954(c), 955(f). Before making a decision on a particular grant application, however, the Chairperson must consult and receive the advice of the 26-member National Council on the Arts.[2] 20 U.S.C. 955(f). The Chairperson may not approve any application disapproved by the National Council. Id. The Chairperson must also utilize advisory panels to review applications and make recommendations to the National Council. 20 U.S.C. 959(c).
 
 
 3
 An advisory panel recommended approval of plaintiffs' applications; a majority of the Council recommended disapproval; the Chairperson denied the applications. The district court concluded the statutory standard under which the applications were Judged, which requires the NEA to "take into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. 954(d)(1), violated plaintiffs' due process and free speech rights.[3]
 
 I.
 
 4
 The void-for-vagueness doctrine incorporates several important due process principles.[4] It requires that a law give fair notice of its mandate. "Because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned v. City of Rockford, 408 U.S. 104, 108, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972). The void-for-vagueness doctrine also requires that a law provide explicit standards for those who are to apply it. "A vague law impermissibly delegates basic policy matters to policemen, Judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Id. at 108-09.
 
 
 5
 The twin dangers of a vague law - lack of notice and arbitrary or discriminatory application - may chill the exercise of important constitutional rights. "Where a vague statute 'abuts upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" Id. at 109 (citation omitted). Not surprisingly, therefore, courts apply a heightened vagueness standard to a law that could deter protected speech because of its uncertain meaning. N.A.A.C.P. v. Button, 371 U.S. 415, 432-33, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963) ("Standards of permissible statutory vagueness are strict in the area of free expression. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").[5]
 
 A.
 
 6
 NEA's primary contention is that the vagueness of the "decency and respect" provision is not an issue. In its view, Congress did not compel NEA to add this element to the standard for judging grant applications, and the NEA elected not to add it. The standard therefore remains as it was before the amendment: the sole criteria for judging grant applications are "artistic excellence and artistic merit."
 
 
 7
 NEA reads the "decency and respect" amendment as requiring only that the Chairperson " take into consideration general standards of decency and respect for diverse beliefs and values" when promulgating regulations and procedures for judging grant applications. 20 U.S.C. 954(d)(1) (emphasis added). According to NEA, the Chairperson did address Congress's concern that decency and respect for diverse beliefs and values be considered in funding decisions, and concluded no change in the regulations was necessary because the NEA's governing statute requires advisory panels with diversified membership to review applications and make recommendations to the National Council.[6] The Chairperson reasoned that because advisory panels were composed of members chosen to reflect a wide range of backgrounds and points of view, the decisions of these panels as to the artistic excellence and merit of individual applications would necessarily reflect general standards of decency and show respect for the diverse beliefs and values of the American public.
 
 
 8
 This interpretation reads 954(d) as if it had not been amended. Congress added the clause at issue - "taking into consideration general standards of decency and respect" - immediately after the clause specifying the criteria by which applications are to be Judged - "artistic excellence and artistic merit." Read together, these clauses instruct the Chairperson to ensure that standards of decency and respect for diverse values are considered when judging the artistic merit and excellence of an application.
 
 
 9
 Congress spoke in mandatory terms when it amended the criteria for judging grant applications: "the Chairperson shall ensure that . . . artistic excellence and artistic merit are the criteria by which applications are Judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. 954(d) (emphasis added). This language does not grant the Chairperson broad discretion in establishing criteria for judging grant applications, as NEA contends; it actually restricts the Chairperson's discretion by requiring him or her to Judge applications according to standards of "decency and respect."[7]
 
 
 10
 NEA's reading of 954(d)(1) is also contrary to traditional canons of statutory construction. If 954(d)(1) required nothing more than diverse advisory panels, the "decency and respect" provision would be redundant in view of 959(c), also adopted as part of the 1990 amendments, which expressly requires that advisory panels reflect diversity.[8] See Freytag v. Commissioner, 501 U.S. 868, 877, 115 L. Ed. 2d 764, 111 S. Ct. 2631 (1991) ("Our cases consistently have expressed 'a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment.'") (citation omitted).[9]
 
 
 11
 And turning to the legislative history, as we do to interpret an ambiguously worded statute, makes it clear that Congress intended to change the standard NEA applied in judging applications for funding, not simply to ask the NEA to consider the problem. NEA had been attacked for funding controversial artists and art works. Criticism had focused on a series of photographs by Robert Mapplethorpe objected to as homoerotic images, and on a photograph by Andres Serrano criticized as blasphemous. The "decency and respect" provision was enacted in direct response to this controversy and was specifically designed to prevent the funding of similar art works. Members of Congress noted that the "decency and respect" provision would prevent the funding of similar works in the future.[10] 136 Cong. Rec. H9410-57 (Oct. 11, 1990).
 
 
 12
 In the words of Representative Henry, author of the provision: "This substitute includes language in the heart of the grant making . . . process. We add to the criteria of artistic excellence and artistic merit, a shell, a screen, a viewpoint that must be constantly taken into account on behalf of the American public . . . ." 136 Cong. Rec. H9417 (Oct. 11, 1990). Representative Henry described the provision as "new language now in the grant procedure itself which mandates that in the awarding of funds, in the award process itself, general standards of decency must be accorded." 136 Cong. Rec. H9457 (Oct. 11, 1990). In the same vein, Representative Coleman, cosponsor of the bill, said: "We have added language . . . which underscores that the decisions of artistic excellence must take into consideration general standards of decency and respect for the diverse beliefs and values of the American public. Works which deeply offend the sensibilities of significant portions of the public ought not to be supported with public funds." 136 Cong. Rec. H9410 (Oct. 11, 1990).
 
 
 13
 In concluding that Congress intended to include the criteria of "decency and respect" in the standard for judging grant applications, we reject NEA's contention that 954(d)(1) is to be read as a compromise between legislators who wanted to impose explicit content restrictions upon funding and those who wanted to impose no "decency and respect" restriction at all, and agreed simply to identify "decency and respect" as an area of concern but require no further action by NEA. No proposal submitted to Congress would have permitted funding with no content restriction at all. The dispute was not over whether NEA should be free to fund indecent or disrespectful art, but over the way in which the new limitation would be imposed: whether Congress should specify categories of art that could not be funded or instruct NEA to consider general standards of "decency and respect" in judging the artistic merit of a grant application. Congress settled on the latter approach.
 
 
 14
 We also reject NEA's argument that Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984), requires deference to NEA's construction of its statutory mandate. NEA's construction of the statute as permitting the Chairperson to rely upon greater diversity in advisory panel membership in lieu of a change in the criteria for judging grant applications is not a "permissible" or "reasonable" one to which deference is required. Id. at 843-45. Moreover, NEA itself did not in practice adopt the interpretation of the "decency and respect" provision it advocates in this litigation. In a meeting held on December 14 and 15, 1990, the Chairperson and National Council considered a number of proposals to implement the "decency and respect" provision. They did not question their obligation under 954(d)(1) to Judge grant applications according to "general standards of decency and respect for the diverse beliefs and values of the American public." Instead, to satisfy this new obligation, NEA officials adopted the approach of having the Chairperson instruct advisory panel members to bring their own definitions of these terms "to the table" and make them "part of the deliberative process." Minutes of the December 1990 Retreat of the National Council on the Arts at 21, S.E.R. at 23.
 
 B.
 
 15
 NEA contends that even if 954(d)(1) requires it to Judge grant applications according to general standards of decency and respect, the Chairperson could by regulation implement this standard in a way that would obviate the vagueness problem. However, the NEA has failed to present a narrowing construction that is consistent with the language and purpose of the statute, and "we will not rewrite a . . . law to conform it to constitutional requirements." Virginia v. American Booksellers Ass'n., 484 U.S. 383, 397, 98 L. Ed. 2d 782, 108 S. Ct. 636 (1988); see also Heckler v. Mathews, 465 U.S. 728, 741, 79 L. Ed. 2d 646, 104 S. Ct. 1387 (1984) ("The canon favoring constructions of statutes to avoid constitutional questions does not . . . license a court to usurp the policymaking and legislative functions of duly elected representatives.").
 
 
 16
 NEA suggests the Chairperson could apply 954(d)(1) by rejecting applications for funding of projects that are obscene under the standard announced in Miller v. California, 413 U.S. 15, 24-25, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973) - a standard that passed the vagueness test in Hamling v. United States, 418 U.S. 87, 110-16, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974). However, the proposed construction would render redundant a separate prohibition against funding projects determined to be obscene, subsection (2) of section 954(d).[11] See Freytag, 501 U.S. at 877. Congress adopted the "decency and respect" provision because it was broader and had a different meaning than the provision prohibiting the funding of obscene art.[12] Moreover, the NEA's proposed construction would be contrary to the express intent of Congress that determinations of obscenity be made by the courts and not by NEA.[13]
 
 
 17
 NEA also seems to suggest the Chairperson might avoid the vagueness problem by adopting the definition of "indecent communication" promulgated by the Federal Communication Commission and applying the standard only to works intended for children.[14] This construction is precluded by Congress's explicit refusal to include the FCC's definition of indecency in 954(d)(1).[15] Congress considered the definition inappropriate for the arts, even if appropriate for broadcasting.[16] Moreover, unlike the statute implemented by the FCC's regulation, 954(d)(1) is not aimed solely at indecent speech harmful to minors, but requires the NEA to Judge all grant applications according to both "general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. 954(d)(1) (emphasis added). Nothing in 954(d)(1) or its legislative history suggests the NEA may choose to apply the "decency and respect" provision to some funding applications and not to others or that it may ignore the "respect" criterion when it does apply the provision.
 
 C.
 
 18
 NEA and the Dissent argue the "decency and respect" provision is not subject to a vagueness challenge because it does not regulate conduct directly but merely subsidizes speech. Although the need for fair warning may be less when a statute does not directly regulate conduct, the need for specific standards to prevent arbitrary and discriminatory application of provisions that touch upon speech may be even greater when a statute subsidizes speech and the risk that the provision on its face will inhibit speech remains. See Grayned, 408 U.S. at 108; Bullfrog Films, Inc. v. Wick, 847 F.2d 502, 514 (9th Cir. 1988) (holding void for vagueness a regulatory provision exempting from import duties certain types of written materials); Big Mama Rag, Inc. v. United States, 203 U.S. App. D.C. 448, 631 F.2d 1030, 1039 (D.C. Cir. 1980) (holding void for vagueness a tax exemption for educational and charitable organizations).[17]
 
 
 19
 NEA also argues that the decency provision is not subject to a vagueness challenge because it merely directs the Chairperson to promulgate regulations and establish procedures to govern applications for funding; such regulations and procedures may be subject to the void-for-vagueness test, but the direction to the Chairperson to establish them is not. This argument rests on the interpretation of 954(d)(1) rejected earlier. Section 954(d)(1) is not a broad grant of regulatory authority which the Chairperson may implement in a discretionary manner, but a directive to the NEA to Judge grant applications according to standards of "decency and respect."
 
 
 20
 * * *
 
 
 21
 The "decency and respect" provision was enacted to prevent the funding of particular types of art. To that end, it places a mandatory duty on the Chairperson to ensure that grant applications are Judged according to "general standards of decency and respect for the diverse beliefs and values of the American public." The Chairperson has no discretion to ignore this obligation, enforce only part of it, or give it a cramped construction. Rather, the Chairperson, Council, and advisory panels must examine each grant application to determine if it comports with "general standards of decency" and shows "respect for diverse beliefs and values" as they subjectively understand these terms. The record indicates this is exactly how the Chairperson and Council interpreted the provision prior to this litigation.
 
 
 22
 So construed, the "decency and respect" provision violates due process because "no standard of conduct is specified at all," Coates v. City of Cincinnati, 402 U.S. 611, 614, 29 L. Ed. 2d 214, 91 S. Ct. 1686 (1971), and the statute thus provides no "ascertainable standard for inclusion and exclusion." Smith v. Goguen, 415 U.S. 566, 578, 39 L. Ed. 2d 605, 94 S. Ct. 1242 (1974). Without doubt, persons "of common intelligence must necessarily guess at [the] meaning and differ as to [the] application" of the terms "decency" and "respect." See Connally v. General Constr. Co., 269 U.S. 385, 391, 70 L. Ed. 322, 46 S. Ct. 126 (1926). These terms are inherently ambiguous, varying in meaning from individual to individual. See Smith, 415 U.S. at 573 ("What is contemptuous to one . . . may be a work of art to another."); Coates, 402 U.S. at 614 ("Conduct that annoys some people does not annoy others."); Cohen v. California, 403 U.S. 15, 25, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (1971) ("One['s] vulgarity is another's lyric."). The content of the term "diverse beliefs and values of the American public" is also impossible to define. The individual members of a pluralistic society, and particularly our own, have a great variety of beliefs and values, largely unascertainable. See Bullfrog Films, 847 F.2d at 513.
 
 
 23
 Since it is not susceptible to objective definition, the "decency and respect" standard gives rise to the danger of arbitrary and discriminatory application.[18] It grants government officials power to deny an application for funding if the application offends the officials' subjective beliefs and values. Inevitably, NEA's decision not to fund a particular artist or project as indecent or disrespectful will depend in part on who is judging the application and whether that official agrees with the artist's point of view. Under such a grant of authority, funding may be refused because of the artist's political or social message or because the art or the artist is too controversial. This danger is especially pronounced because a vague statute effectively shields decisions from review. Where First Amendment liberties are at stake, such a grant of authority violates fundamental principles of due process.
 
 II.
 
 24
 Our holding that 954(d)(1) is unconstitutionally vague effectively disposes of this case. However, in view of the Dissent's argument that the government may restrict the content of speech it funds, we briefly explain why the First Amendment's[19] prohibition on content- and viewpoint-based restrictions provides an alternate ground for our decision.
 
 
 25
 "It is axiomatic" that under the First Amendment, "the government may not regulate speech based on its substantive content or the message it conveys." Rosenberger, ______ U.S. at _____, 115 S.Ct. at 2516; see also Action for Children's Television v. F.C.C., 313 U.S. App. D.C. 94, 58 F.3d 654, 659 (D.C. Cir. 1995). A content-based restriction on speech is therefore presumed unconstitutional, Rosenberger, _____ U.S. at _____, 115 S.Ct. at 2516, and must be subjected to "'the most exacting scrutiny.'" Texas v. Johnson, 491 U.S. 397, 412, 105 L. Ed. 2d 342, 109 S. Ct. 2533 (1989) (quoting Boos v. Barry, 485 U.S. 312, 321, 99 L. Ed. 2d 333, 108 S. Ct. 1157 (1988)). To survive this scrutiny, the government must advance a compelling interest served by its regulation of the content of protected speech, and the regulation must be narrowly tailored to serve that interest. Sable Communications v. F.C.C., 492 U.S. 115, 126, 106 L. Ed. 2d 93, 109 S. Ct. 2829 (1989); Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.,_____ U.S. _____, _____, 116 S. Ct. 2374, 2385, 135 L. Ed. 2d 888 (1996) (government may directly regulate speech "to address extraordinary problems, where its regulations are appropriately tailored to resolve those problems without imposing an unnecessarily great restriction on speech"); Action for Children's Television, 58 F.3d at 659.
 
 
 26
 The presence of government funding alters this framework somewhat. The government may make content-based choices "when it is the speaker or when it enlists private entities to convey its own message." Rosenberger, _____ U.S. at _____, 115 S. Ct. at 2518. Thus, the Supreme Court has upheld regulations that granted tax deductions for veterans' groups but not for other charitable groups engaged in lobbying, see Regan v. Taxation With Representation, 461 U.S. 540, 545-48, 76 L. Ed. 2d 129, 103 S. Ct. 1997 (1983), and barred recipients of federal family planning funds from providing information on abortion. Rust v. Sullivan, 500 U.S. 173, 200, 114 L. Ed. 2d 233, 111 S. Ct. 1759 (1991). As the Court explained in Rust, "when the government appropriates public funds to establish a program it is entitled to define the limits of that program." Id. at 194.
 
 
 27
 Government funding does not invariably justify government control of the content of speech, however. In Rust, the Court cautioned that its holding would not apply to public fora or to universities, which occupied "a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted." Rust, 500 U.S. at 200.
 
 
 28
 In addition, Rust and Rosenberger identify two related contexts in which the government may subsidize speech only if it does so in a way that is viewpoint-neutral. Neutrality may be required because the area is a "traditional sphere of free expression," Rust, 500 U.S. at 200, or because the government has declared its intention to "encourage a diversity of views from private speakers." Rosenberger, _____ U.S. at _____, 115 S. Ct. at 2519. Both approaches support the district court's Conclusion that government funding of the arts, in the circumstances of this case, must be viewpoint-neutral.
 
 
 29
 As the district court explained, the arts, no less than the university, are "at the core of a democratic society's cultural and political vitality," Finley, 795 F. Supp. at 1473. The district court's analysis is full and cogent, and we need not repeat it here.[20] Similarly, Congress has clearly indicated the NEA's purpose is to support a diverse array of artistic expression. Even the most cursory review of the NEA's enabling statute reveals this intent. In its findings, Congress emphasized that a democracy must "honor and preserve its multicultural artistic heritage as well as support new ideas" and declared its intent "to help create and sustain . . . a climate encouraging freedom of thought, imagination, and inquiry." 20 U.S.C. 951(10), (7). The Senate Report accompanying the legislation emphasized that "freedom of artistic and humanistic expression" was to be given "the fullest attention" and that "conformity for its own sake is not to be encouraged, and . . . no undue preference should be given to any particular style or school of thought or expression." See S. Rep. No. 300, 89th Cong., 1st Sess. 4 (1965). The House reaffirmed this view in adopting the 1985 amendments to the NEA's governing legislation, urging NEA to be "more responsive to funding programs that represent the many traditions in our heritage and the full cultural diversity of our citizens. . . . The [funded] programs should be open and richly diverse, reflecting the ferment of ideas which has always made this Nation strong and free." H. R. Rep. No. 274, 99th Cong., 1st Sess. 13, reprinted in 1985 U.S.C.C.A.N. 1055, 1058. The NEA and it programs were created to encourage diverse private speech and not, as the Dissent suggests, to engage in "speech for hire."
 
 
 30
 The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger, _____ U.S. at _____, 115 S. Ct. at 2516 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983)); see Johnson, 491 U.S. at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). Even when the government is funding speech, it may not distinguish between speakers on the basis of the speaker's viewpoint or otherwise "aim at the suppression of dangerous ideas." Regan, 461 U.S. at 548 (quoting Cammarano v. United States, 358 U.S. 498, 513, 3 L. Ed. 2d 462, 79 S. Ct. 524 (1959)); see Hannegan v. Esquire, Inc., 327 U.S. 146, 158-59, 90 L. Ed. 586, 66 S. Ct. 456 (1946).
 
 
 31
 Therefore, we cannot agree with NEA's assertion that the "decency and respect" provision does not reflect viewpoint discrimination.[21] In Rosenberger, the Supreme Court found viewpoint discrimination in a university regulation that "selected for disfavored treatment those student journalistic efforts with religious editorial viewpoints." _____ U.S. at _____, 115 S. Ct. at 2517. Central to the court's decision was the fact that under the regulation, any topic treated from a religious perspective would be denied funding. See id. ("Religion . . . provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered. The prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments."). Here too, it is the treatment of a subject, not the subject itself, that is disfavored. Two depictions of the same subject matter - an American flag, for example - could be treated differently if NEA believed one depiction symbolized an "indecent" perspective or demonstrated disrespect for "the diverse beliefs and values of the American public," and the other did not.
 
 
 32
 The Dissent argues we have erred in applying the body of law for regulation of speech and generally available entitlements to prizes. According to the Dissent, since the NEA grants are a prize given to a select few, rather than a generally available benefit, the government can choose to support only a certain viewpoint. The Supreme Court explicitly rejected a similar argument by the University in Rosenberger. As the Court explained, "the government cannot justify viewpoint discrimination among private speakers on the economic fact of scarcity." _____ U.S. at _____, 115 S. Ct. at 2519. Although NEA awarded only 88 grants from an applicant pool of 5,168, it cannot provide those scarce grants to favor a particular viewpoint. See id. at _____ _ _____, 115 S.Ct. at 2519-20 (rejecting the University's argument that "scarcity would give the State the right to exercise viewpoint discrimination that is otherwise impermissible").
 
 
 33
 NEA contends the "decency and respect" provision is permissible because it can be implemented in a viewpoint- and content-neutral way.[22] As we have explained, however, 954(d)(1) on its face requires NEA to take "decency" and "respect" into account in considering grant applications. Like the funding restriction at issue in Rosenberger, the "decency and respect" provision clearly focuses on the content of the speech at issue; it "has a speech-based restriction as its sole rationale and operative principle." Rosenberger, _____ U.S. at _____, 115 S. Ct. at 2519.
 
 
 34
 The "decency and respect" provision authorizes viewpoint discrimination, an "egregious form of content discrimination." Rosenberger, 115 S. Ct. at 2516. Because the government has made no attempt to articulate a compelling interest served by the provision,[23] 954(d)(1) cannot survive strict scrutiny.[24]
 
 III.
 
 35
 The "decency and respect" provision of 954(d)(1) is void for vagueness under the Fifth Amendment, and impermissibly restricts plaintiffs' First Amendment rights as well.
 
 
 36
 AFFIRMED.
 
 KLEINFELD, Circuit Judge, Dissenting:
 
 37
 I respectfully Dissent.
 
 
 38
 First Amendment law has taken some odd turns lately. We now live in a legal context prohibiting display of a cross or menorah on government property. American Jewish Congress v. City of Beverly Hills, 90 F.3D 379 (9th Cir.1996), Separation of Church and State Committee v. City of Eugene, 93 F.3d 617 (9th Cir.1996). But if a cross is immersed in urine, a government grant cannot be withheld on the ground that the art would offend general standards of decency and respect for the religious beliefs of most Americans. The government, under today's decision, cannot even consider "general standards of decency and respect for the diverse beliefs and values of the American public" when it gives artists grants. Yet we penalize private employers for slowness in firing employees who do not show decency and respect for other employees. See Steiner v. Showboat Operating Company, 25 F.3d 1459 (9th Cir. 1994). This self-contradictory silliness is not built into the Bill of Rights. The First Amendment does not prohibit the free exercise of common sense.
 
 
 39
 Artists, and for that matter, non-artists, are constitutionally entitled to express themselves indecently and disrespectfully toward the beliefs and values of as much of the American public as they like. Indecency sometimes helps to communicate an idea effectively, and it is constitutionally protected. See Cohen v. California, 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (1971). Lenny Bruce's monologues needed offensive indecency to accomplish their legitimate artistic objective. The same language that gave rise to liability in Steiner was essential to Allen Ginsberg's artistic expression in Howl and Kaddish. The great Modigliani nudes are frankly erotic and focus on the models' pubic hair; our Constitution unquestionably protects them from censorship. Less artistically distinguished attempts to communicate by means of offensiveness and indecency are also entitled to First Amendment protection. Molly Bloom's soliloquy, Aristophanes' jokes about passing gas, Shakespeare's double entendres, the indecent kiss in Chaucer's Miller's Tale, and countless works by lesser artists, such as Samuel Clemens' 1601 and Vladimir Nabakov's Lolita, are all part of the ancient artistic tradition of using the impolite or indecent in art. Every general art history textbook reproduces and discusses Edouard Manet's Luncheon On the Grass, a painting of a nude woman looking at the artist while two fully clothed men sit next to her and talk to each other. The content and viewpoint doubtless offend, but the art history books are constitutionally protected regardless. There can be no constitutional excuse for allowing the government to censor art on grounds of indecency or offensiveness. I hope that it is still as clear as it was when Cohen came down that anyone in America, artist or not, has a constitutional right to express himself indecently and offensively.
 
 
 40
 That offensive or indecent expression cannot be censored does not mean that the government has to pay for it. By drawing the line between private expression and government conduct, we preserve liberty for individual expression, while preserving democracy for governmental decisions. Any time government enters a previously private sphere of conduct, the line becomes blurred, and the issues difficult. Government subsidy of art was an easy issue when the Medicis hired artists - the Medicis could freely impose their preferences. But when a democratic government pays artists to stick their thumbs in the public's eye, the public naturally becomes annoyed, and attempts to exercise its ordinary authority in a democracy to control through Congress how tax monies are spent.
 
 
 41
 Whether government can consider content and viewpoint depends on whether the money it gives out is generally available to all who meet some basic standard, or whether it is a prize given to a select few. Only 88 out of 5168 applicants for Visual Artists Fellowships won grants in fiscal year 1994. 1994 Annual Report, National Endowment for the Arts 10. Applying for an NEA arts grant is not like applying for welfare, social security, a tax exemption, or a student activity grant. NEA grants are prizes for the fortunate few, not entitlements.
 
 
 42
 The case at bar does not involve government censorship. If Congress had prohibited artists from expressing themselves indecently or disrespectfully, the Constitution would make such a law null and void. The NEA statute before us is not such a law. It does not restrict what artists do. It restricts what the NEA can do. This case is about whether the American people can require a government agency to consider, in giving grants to very few of the many artists in the country, "general standards of decency and respect for the diverse beliefs and values of the American public."
 
 
 43
 Our decision today creates a conflict with the only other circuits to have confronted a similar issue. Advocates for the Arts v. Thomson, 532 F.2d 792 (1st Cir.), cert. denied, 429 U.S. 894, 50 L. Ed. 2d 177, 97 S. Ct. 254 (1976). In Advocates, New Hampshire denied an NEA grant to a literary magazine because the governor and state arts commission thought a poem it published was indecent. The First Circuit, rejecting the First Amendment challenge, explained that denial of a grant was not suppression of speech, and the grant selection process necessarily discriminated based on content:
 
 
 44
 Public funding of the arts seeks "not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge" artistic expression. A disappointed grant applicant cannot complain that his work has been suppressed, but only that another's has been promoted in its stead. The decision to withhold support is unavoidably based in some part on the "subject matter" or "content" of expression, for the very assumption of public funding of the arts is that decisions will be made according to the literary or artistic worth of competing applicants.
 
 
 45
 Id. at 795.
 
 
 46
 Advocates suggests that every disappointed grant applicant has the same First Amendment right of self-expression, but that does not mean that every disappointed grant applicant has a First Amendment claim. Id. at 795-96. Suppose the NEA arts panel discriminates by viewpoint against an excellent artist whose work is too conventional for the panel's tastes - an artist with the superb technique of a Robert Mapplethorpe and the vision of a Norman Rockwell. And suppose it discriminates against another whose art is too indecent and offensive. And another, whose viewpoint is interesting but whose technique is less than excellent. Do all have First Amendment claims under the majority decision? Only the one who creates indecent art? Only the ones with excellent technique? It is impossible to have a highly selective grant program without denying money to a large amount of constitutionally protected expression, decent and indecent.
 
 
 47
 The Seventh Circuit ruled similarly to the First Circuit, in Piarowski v. Illinois Community College, 759 F.2d 625 (7th Cir. 1985). The chairman of the art department hung his stained glass panels of such subjects as "the naked rump of a brown woman, and sticking out from (or into) it a white cylinder" in the college's gallery near the main entrance to a heavily trafficked building. The college told him to move three panels to a less heavily trafficked fourth floor display space, after receiving "complaints from students, cleaning women, and black clergymen." Id. at 628. The main entrance space was especially desirable, but not a public forum, and not available to all. The artist lost his case.
 
 
 48
 The Seventh Circuit distinguished between what an artist is free to create, and what the government must display.
 
 
 49
 If Claes Oldenberg, who created a monumental sculpture in the shape of a baseball bat for display in a public plaza in Chicago, had created instead a giant phallus, the city would not have had to display it next to a heavily trafficked thoroughfare.
 
 
 50
 Id. at 630.
 
 
 51
 Advocates points out the resemblance of a government grant program to a government auditorium providing space for artistic performances. If it is a public forum, then neutrality is required by the First Amendment. Advocates, 532 F.2d at 796. But if the space is available only to a select few invited exhibitors as in Piarowski, then the government, already excluding much constitutionally protected art, need not be neutral toward offensive or indecent art. That is why, in the Piarowski example, Chicago would be free to discriminate in favor of baseball bats and against phalluses in the hypothetical display.
 
 
 52
 The majority tries to distinguish the First Circuit and Seventh Circuit cases on the ground that they came down before Rosenberger v. Rector & Visitors of University of Virginia, _____ U.S. _____, 132 L. Ed. 2d 700, 115 S. Ct. 2510 (1995), and Rosenberger now prohibits the content or viewpoint discrimination they allowed. That misreads Rosenberger. The university which lost Rosenberger paid expenses for virtually all student organizations, but denied the money to plaintiffs because they expressed a Christian viewpoint. In its zeal to steer clear of the establishment clause, the university, like the school district in Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993), overlooked the free speech clause.
 
 
 53
 Rosenberger holds that a university which makes money generally available for student groups' expenses, to encourage a diversity of views rather than to express its own, cannot discriminate against an applicant based on that applicant's viewpoint. Rosenberger teaches that when government makes a benefit generally available to all within a diverse class, it cannot make an exception based on what a particular applicant wishes to say. This extends Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993), from space to money, thereby preventing discrimination against speech on the ground that it was religious. A public forum can be created by money, not just real estate. This is because speech is often disseminated by print and electronics, rather than by standing in front of people and talking to them. Cf. Buckley v. Valeo, 424 U.S. 1, 19, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976).
 
 
 54
 We and the District of Columbia Circuit had decided, before Rosenberger, what might be classified as money-as-a-public-forum cases. In Bullfrog Films, Inc. v. Wick, 847 F.2d 502 (9th Cir. 1980), we held that customs duties exemptions for any educational or cultural materials could not exclude propaganda films based on their content and viewpoint. In Big Mama Rag, Inc. v. United States, 203 U.S. App. D.C. 448, 631 F.2d 1030 (D.C. Cir. 1980), the District of Columbia Circuit held that a tax exemption generally available to educational organizations could not be denied based on a regulation requiring full and fair exposition of facts enabling a reader to draw an independent Conclusion. Under these cases, all applicants in the class were entitled to the financial benefit from the government, unless the content of their speech was contrary to government standards. By contrast, in the case at bar, no applicant is entitled to the financial benefit.
 
 
 55
 The case at bar would be analogous to Rosenberger (and I would join the majority in rejecting the "decency and respect" clause as unconstitutional), if the NEA gave out grants to virtually all artists except for those whose work violated "general standards of decency and respect for the diverse beliefs and values of the American public." Arts grants would then be the financial equivalent of a tax credit for all artists, and under Rosenberger, Big Mama Rag and Bullfrog, the financial benefit could not be conditioned on a vague and content- or viewpoint-based criterion like the "decency and respect" formula. Much as parade permits may be allocated on a first come first served principle, but not to favor particular viewpoints, arts grants would have to be allocated on some neutral principle, such as first come first served, or random selection. Cf. Rosenberger, _____ U.S. at _____, 115 S. Ct. at 2519.
 
 
 56
 It is not the case that whenever the government gives money to someone for talking, the recipient may say, with the government's money, whatever he or she likes. The government can hire people to say what it wants, and require them to say it.
 
 
 57
 When government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.
 
 
 58
 Rosenberger, _____ U.S. at _____, 115 S. Ct. at 2519 (explaining Rust v. Sullivan, 500 U.S. 173, 114 L. Ed. 2d 233, 111 S. Ct. 1759 (1991)). But when the government gives money to encourage a diversity of views from private speakers in a class not defined by what they say, such as university students, it "may not silence the expression of selected viewpoints." Id.
 
 
 59
 The majority misreads Rosenberger's rejection of the University of Virginia's argument that scarcity of money justified viewpoint discrimination. Rosenberger, _____ U.S. at _____ _ _____, 115 S. Ct. at 2519-20. The context was a program in which grants went to virtually all speakers but those with a Christian viewpoint, not to everyone except for a few prizewinners. The Court explained that the Student Activities Fund at the University of Virginia "is a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable." Id. at _____, 115 S.Ct. at 2517. This is the concept which I have expressed perhaps more crudely, as teaching us that a public forum can be created by money, not just real estate. Had the University of Virginia set up a prize fund, for student groups which contributed the most to the betterment of secular civic life in Charlottesville, the Christian student groups would have had no constitutional claim of discrimination had they lost. Had the NEA grant program been structured to award grants to virtually all artists, then the plaintiffs in the case at bar would be entitled to prevail under Rosenberger. The majority uses principles for entitlement and regulation cases in a prize case. The principles are by and large right, the application wrong.
 
 
 60
 When the government gives a prize rather than an entitlement, it necessarily discriminates by content and viewpoint. Congress decided to foster the arts, but many Congressmen were doubtless aware of artists' tendency since the romantic period to challenge the conventional. Thus Congress imposed several content and viewpoint criteria for arts grants. These include "artistic excellence," promoting cultural diversity, and reflecting the culture of inner cities, rural areas, and tribal communities.[1] Congress thereby discriminated against non-artistic expressions of opinion, artistic expression favoring cultural homogeneity, and art reflecting suburban culture. Norman Rockwell and Ansel Adams could reasonably complain, were they applying for grants, that the statute constitutes viewpoint discrimination against their artistic expression.
 
 
 61
 Of course the statutory criteria are vague. "Decency and respect for the diverse beliefs and values of the American people" is vague. "Artistic excellence" and "artistic merit" are also vague, and could not be proper criteria for censorship or discrimination in an entitlement program. The constitution would not allow the government to censor expression on the ground that it was not art, or though art, was not excellent art. But this does not mean that the government cannot condition prizes on the excellence of art.
 
 
 62
 Philosophers have no way to distinguish art from non-art, or good art from bad art. There is not even a useful vocabulary for most of the distinctions we need to identify "artistic excellence":
 
 
 63
 In certain kinds of writing, particularly in art criticism and literary criticism, it is normal to come across long passages which are almost completely lacking in meaning. Words like romantic, plastic, values, human, dead, sentimental, natural, vitality, as used in art criticism, are strictly meaningless, in the sense that they not only do not point to any discoverable object, but are hardly ever expected to do so by the reader. When one critic writes, "The outstanding feature of Mr. X's work is its living quality," while another writes, "The immediately striking thing about Mr. X's works is its peculiar deadness," the reader accepts this as a simple difference of opinion. If words like black and white were involved, instead of the jargon words dead and living, he would see at once that the language was being used in an improper way.
 
 
 64
 George Orwell, Politics and the English Language, in A Collection of Essays 156, 161-162 (emphasis in original) (essay dated 1946).
 
 
 65
 The most used art history text points out the vagueness of the entire NEA grant scheme:
 
 
 66
 But if we must give up any hope of a trustworthy rating scale for artistic quality, can we not at least expect to find a reliable, objective way to tell art from non-art? Unfortunately, even this rather more modest goal proves so difficult as to be almost beyond our powers.
 
 
 67
 H. W. Janson, History of Art 9 (1962). It took a century and a half for most critics to agree that photography could be art. Some have not yet admitted jazz to the pantheon, many, rock and roll. Some disagree on whether Bernstein's West Side Story is art or mere entertainment, let alone excellent art. If the constitutional law principle prohibiting vague laws relating to speech applied to NEA grants, then we could no more let the government give out grants for excellent art, than let it censor literary and artistic expressions which in the opinion of some customs agent or policeman (or art critic) were bad art.
 
 
 68
 The majority says that the vagueness of "artistic" and "excellence" are constitutionally permissible, unlike "decency" and "respect," because the people making the decisions are experts. Maj. op. at 14518-19, n.18. By that principle, it would be permissible to let the government censor speech with vague laws, so long as the censors were experts in the field being censored. The argument is wrong, because the panel members' purported expertise does not give fair warning to artists of what will get them grants and what will not. Nor are the purported experts' choices sufficiently constrained by "artistic" and "excellence" to prevent arbitrariness. Quite a few NEA grants have gone to activities which many experts would deem not excellent, or not art. There is no principled way to keep the arts grants but strike the decency and respect clause. Either Congress can provide for arts grants with vague criteria, or it cannot provide for them at all.
 
 
 69
 Artists seeking grants have no property right to them, and their liberty to express themselves as they choose is not regulated by the grants. Vagueness law has been developed under the Fifth Amendment to protect people from the taking of liberty or property without fair notice of what they may not do, and without protection against arbitrary enforcement. See Kolender v. Lawson, 461 U.S. 352, 357, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983). First Amendment vagueness doctrine applies to government action relating to speech if the government regulates speech or conditions a generally available benefit upon the content of speech. See Rust v. Sullivan, 500 U.S. 173, 200, 114 L. Ed. 2d 233, 111 S. Ct. 1759 (1991) ("conditions attached to expenditures of Government funds"); Gentile v. State Bar of Nevada, 501 U.S. 1030, 1051, 115 L. Ed. 2d 888, 111 S. Ct. 2720 (1991) ("prohibition against vague regulations of speech"). An artist applying for an NEA grant has no formula, and is not entitled to one, for the painting or performance which will produce a grant. None of the purposes of vagueness law apply to prizes.
 
 
 70
 The majority construes the statute as though it prohibited the NEA from awarding grants to offensive or indecent art. I doubt it would matter if the statute said that. Congress may be free to condition these scarce NEA grants on content. If Congress hired a sculptor to create a bust for the Capitol, it could tell him to do a bust of Abraham Lincoln, and prohibit him from doing a bust of John Wilkes Booth. Or it could tell the sculptor to make busts only of people who had served in the Senate, or perhaps only of "great" Senators, despite the vagueness of that criterion. That much is clear under Rust. Just as Fulbright grants to foreign students may be conditioned on "directing their talents and initiative into channels which will make them more effective leaders," 22 U.S.C. 2454(e)(3), prizes for only a few applicants, to which no one is entitled, may be conditioned on vague criteria designed to serve particular congressional objectives.
 
 
 71
 Even if we were to suppose that a specific prohibition of NEA grants based on content or viewpoint would be unconstitutional, the majority has found prohibitions in the statute which are not there. We should not read a statute as though it prohibited what it does not, and then hold it unconstitutional for the imaginary prohibition. The statute does not say that artists must "take into consideration general standards of decency and respect for the diverse beliefs and values of the American public." It says "the Chairperson" of the National Endowment of the Arts must use "artistic excellence" and "merit" as criteria, "taking into consideration," etc.
 
 
 72
 The words "take into consideration" mean take into consideration, no more, no less. The word "consider" in its ordinary usage means "to reflect on" or "think about with a degree of care or caution." See Webster's Third New International Dictionary 483 (1981). In deciding whether to buy a new car, one takes into consideration the expense, but that does not mean one always decides against buying a new car. A requirement that "due consideration and weight shall be given" to something does not make the thing an absolute requirement. See Heirens v. Mizell, 729 F.2d 449, 460 (7th Cir. 1984) (parole board had to consider a prisoner's record but could decide against parole despite a good record). A court of appeals appoints a federal public defender "after considering recommendations from the district court." 18 U.S.C. 3006A(g)(2)(A). That means that we must give serious thought to the district court's recommendations, but we are not required to follow them.
 
 
 73
 Likewise, the NEA might think seriously about Ginsberg's extensive use of vulgar language in Howl and Kaddish, and decide against funding readings of his poems in junior high schools. But after considering the indecency and offensiveness, the NEA could lawfully fund readings in colleges. It might likewise decide for or against funding showings of artistically excellent but highly offensive works such as Leni Riefenstahl's Nazi propaganda movie, Triumph of the Will, or D.W. Griffith's artistically important movie Birth of a Nation, which glorified the Ku Klux Klan. If someone on an advisory panel said "I don't think we can consider the indecency or disrespect for American values of the art - we should fund the grants because the presentations will be of excellent art, and that is all we should consider," another panel member could persuasively reply, "we can and must consider decency and respect - Congress said we should." That is what the "decency and respect" language means, and that is all it means. Chairman Frohnmayer and the members of NEA grants panels probably would have figured out that they lived in a "political world," see maj. op. at p. 14511, n. 7, and that the NEA budget might be affected by what it did with the money, even if Congress had not given them the decency and respect criterion.
 
 
 74
 By contrast with the "take into consideration" language, Congress said that obscenity "shall not be funded." 20 U.S.C. 954(d)(2). That language, unlike "taking into consideration," prohibits funding. The language we now hold unconstitutional tells the Council and panels to think seriously about "general standards of decency and respect for the diverse beliefs of the American public" when they give away the public's money.
 
 
 75
 The artists in the program before us are not affected by the statutory grant criterion in their use of indecency or disrespect in their art done independently of their NEA grants. If the NEA were restricted from giving grants to artists who, outside the grants, had ever done indecent or offensive work, the considerations would be different, possibly leading to a different result. Cf. Federal Communications Commission v. League of Women Voters, 468 U.S. 364, 399-400, 82 L. Ed. 2d 278, 104 S. Ct. 3106 (1984) (acceptance of the government's money unconstitutionally required the recipient to conform to government speech requirements outside the time paid for by the government). The government cannot use its power to condition subsidies as a means of enforcing orthodoxy in areas traditionally open to the public for expressive activity. Rust, 111 S. Ct. at 1776; Regan, 461 U.S. at 548.
 
 
 76
 A prize for some art naturally encourages other artists to try to produce art of the sort which they think will get them the prize, including conformity to the content and viewpoint preferences of those who award the prizes. The members of the grant committees will probably balance their personal tastes against what they fear might lead Congress to cut NEA funding. If government selects a few artists and gives them money, it will unavoidably influence the work of many more:
 
 
 77
 I can seldom do positive good to another person without limiting him. I can, it is true, simply give him money, but even in this extreme case, where I seem to place no bonds on him, he inevitably faces the question of what conduct on his part will lead me to give money to him again.
 
 
 78
 George J. Stigler, The Intellectual and the Market Place 95 (1963). This is a problem of governmental involvement in what used to be a private activity, not a problem of censorship. The United States government has so much money and power that its slightest intervention to do good has the unfortunate effect of changing the entire context in which people act. But unless we are to blind ourselves to the distinction between a relatively few arts prizes, and socializing the art industry, we cannot treat the incentive afforded by a prize as the equivalent of censorship.
 
 
 79
 The artists who brought this lawsuit may have difficulty (the record does not say) attracting enough patrons to support their art. Finley alleges in her complaint that she is a "performance artist whose performances address such issues as the sexual stereotyping and objectification of women, rape and other forms of violence against women, and the powerlessness and victimization of women and others in our society." Fleck alleges that his performances "openly challenge traditional notions of gender and sexuality" and "address AIDS, birth, death, religion, consumption in a capitalist society, and the environment." Hughes alleges that her work "addresses issues of women's power in society and women's sexuality, including lesbian relationships." Miller alleges that his "often autobiographical work addresses the relation between the individual and society, and particularly concerns social activism on issues affecting gay people, including AIDS." These works may lack the mass market of art appealing to more broadly shared sentiments.
 
 
 80
 There is no constitutional principle, however, which requires the government to replace the market and pump up the incomes of less popular artists. Government support of the arts is a policy choice, and perhaps a good one, but it is not constitutionally compelled. Lack of market appeal is an obstacle "not of [the government's] own creation." Regan v. Taxation with Representation Wash., 461 U.S. 540, 549-50, 76 L. Ed. 2d 129, 103 S. Ct. 1997 (1983). So long as the artists are free to perform, people are free to patronize their performances, and the artists are not deprived of government money to which artists generally are entitled, the artists' freedom of expression is not abridged by content or viewpoint discrimination in the grant process.
 
 
 81
 The only practical guarantee of artistic freedom is private money.
 
 
 82
 The leadership of individuals or groups who can back their beliefs financially is particularly essential in the field of cultural amenities, [and] in the fine arts . . . . If minority views are to have a chance to become majority views, it is necessary not only that men who are already highly esteemed by the majority should be able to initiate action but that representatives of all divergent views and tastes should be in a position to support with their means and their energy ideals which are not yet shared by the majority.
 
 
 83
 Friedrich A. Hayek, The Constitution of Liberty 125 (1960, 1978). With diverse sources of private money, majority preferences need not affect an artist's freedom or fortune, because only one or a few patrons or purchasers may suffice.
 
 
 84
 First Amendment law protects individual liberty from government, not the government from the people. The error in today's decision comes from forgetting what the First Amendment is for. The NEA "decency and respect" criterion controls, not artists, but rather a government department, the NEA. By treating legislative control over a part of government as though it were an attempt to control artists' expression, we confound the distinction between popular control of government, and government control of individuals. Majorities do not have the right to control free expression by individuals. They most certainly do have the right to control their government. Today's decision does not protect artists from government. It protects the government from control by the elected representatives of the people.
 
 
 
 *
 Pursuant to Fed. R. App. P. 43(c)(1), Jane Alexander has been substituted for her predecessor in office, Anne-Imelda Radice
 
 
 [1]
 We do not address the district court's ruling in favor of plaintiffs on their claim that the Chairperson violated the NEA's governing statute by obtaining the advice of the National Council on the Arts through a telephone poll before acting on plaintiffs' applications. The parties have settled this issue
 We also do not reach plaintiffs' claim that the statute imposes an unconstitutional condition in violation of F.C.C. v. League of Women Voters, 468 U.S. 364, 82 L. Ed. 2d 278, 104 S. Ct. 3106 (1984). The district court denied summary judgment on the ground that there were disputed issues of fact bearing on the claim, and this denial of summary judgment is not appealable. Because the issue is not properly before us, we do not address the Dissent's suggestion that League of Women Voters is distinguishable.
 
 
 [2]
 The Chairperson and Council members are appointed by the President, by and with the advice and consent of the Senate. 20 U.S.C. 954(b)(1), 955(b)
 
 
 [3]
 20 U.S.C. 954(d), as amended in 1990, reads as follows:
 No payment shall be made under this section except upon application therefor which is submitted to the National Endowment for the Arts in accordance with regulations issued and procedures established by the Chairperson. In establishing such regulations and procedures, the Chairperson shall ensure that - (1) artistic excellence and artistic merit are the criteria by which applications are Judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public. . . . (added language emphasized).
 
 
 [4]
 Although the Dissent argues the applicants have no property right in NEA grants and their liberty to express themselves is not regulated by the grants, the right to engage in free speech is a liberty interest protected by due process. See, e.g., Procunier v. Martinez, 416 U.S. 396, 418, 40 L. Ed. 2d 224, 94 S. Ct. 1800 (1974), overruled on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 104 L. Ed. 2d 459, 109 S. Ct. 1874 (1989); Reed v. Village of Shorewood, 704 F.2d 943, 949 (7th Cir. 1983) ("Freedom of speech is one of the liberties the due process clause has been held to protect."). Art is one of many protected forms of speech. See Miller v. California, 413 U.S. 15, 34, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973). While the artists do not have a property right in the grants, they are protected by the due process clause from arbitrary and discriminatory enforcement of vague standards that "'abuts upon sensitive areas of basic First Amendment freedoms.'" Grayned v. City of Rockford, 408 U.S. 104, 109, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972) (citation omitted)
 The First Amendment, moreover, is an independent source of vagueness doctrine. See N.A.A.C.P. v. Button, 371 U.S. 415, 432-33, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963); Kreimer v. Bureau of Police, 958 F.2d 1242, 1266 (3d Cir. 1992) (explaining that "courts have transplanted this due process principle into the First Amendment setting"). Thus, we routinely consider whether speech-related statutes are impermissibly vague without specifying the liberty or property interest at stake. See Bullfrog Films, Inc. v. Wick, 847 F.2d 502, 512-14 (9th Cir. 1988); Planned Parenthood v. Arizona, 718 F.2d 938, 946-49 (9th Cir. 1983). In this case, we ground our Discussion of vagueness in both the Fifth and First Amendments. In addition, we disagree with the Dissent's suggestion that First Amendment vagueness doctrine only applies if the government regulates speech or places conditions on a generally available benefit. As the Court noted in Rosenberger, the scarcity of a government benefit does not render it immune from constitutional limitations. See Rosenberger v. Rector & Visitors of the Univ. of Virginia, 132 L. Ed. 2d 700, 115 S. Ct. 2510, 2519-20 (1995).
 
 
 [5]
 NEA contends that on review of a facial challenge, plaintiffs may prevail only if "there are no constitutional ways that the statute can be implemented." This standard applies only if the statute "implicates no constitutionally protected conduct." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-95, 71 L. Ed. 2d 362, 102 S. Ct. 1186 (1982); United States v. Wunsch (In re Swan), 84 F.3d 1110, 1119 (9th Cir. 1996). When a law implicates free speech, a "more stringent vagueness test" should apply. Hoffman, 455 U.S. at 499; see also Wunsch, 84 F.3d at 1119
 
 
 [6]
 The statute requires the Chairperson to: "issue regulations and establish procedures . . . to ensure that all panels are composed, to the extent practicable, of individuals reflecting a wide geographic, ethnic, and minority representation as well as individuals reflecting diverse artistic and cultural points of view . . . ." 20 U.S.C. 959(c)
 
 
 [7]
 The Dissent suggests this provision merely requires the NEA to think about standards of decency and respect rather than to act according to what thoughts of "decency and respect" might dictate. This suggestion is implausible on its face and belied by the record. During the period in which the plaintiffs' applications were being considered, Chairperson Frohnmayer told his staff that the NEA had to live in a "political world" and reject some grant applications to "reassure [the NEA's] constituency." (Supplemental Excerpts of Record 148)
 
 
 [8]
 See supra note 6
 
 
 [9]
 NEA's argument that its interpretation of 954(d)(1) does not render the "decency and respect" provision redundant because under NEA's interpretation the Chairman was not compelled to make any change in the standard at all, necessarily fails with our rejection of NEA's interpretation of 954(d)(1)
 
 
 [10]
 Mapplethorpe's and Serrano's works were also referred to during debates on NEA's budget. See, e.g., 135 Cong. Rec. H3637, H3640 (July 12, 1989)
 
 
 [11]
 20 U.S.C. 954(d)(2) reads:
 Such regulations and procedures shall clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded. Projects, productions, workshops, and programs that are determined to be obscene are prohibited from receiving financial assistance under this subchapter from the National Endowment for the Arts. NEA argues the suggested regulation would not render section 954(d)(2) redundant because the latter applies only to material "determined to be obscene" by a court. This argument does not affect the other reasons stated in the text for the invalidity of the hypothetical regulation.
 
 
 [12]
 See 136 Cong. Rec. H9457 (Oct. 11, 1990) (Statement of Rep. Henry) ("[The decency and respect provision] is much broader than all the obscenity language which we have been debating about. . . . Given the Miller versus California standard, anything that has artistic merit is not by legal definition obscene. So, how can we seek to address the problem that we heard from our constituents? We put general decency requirements into the act.")
 
 
 [13]
 "The term 'determined to be obscene' means determined, in a final judgment of a court of record and of competent jurisdiction in the United States, to be obscene." 20 U.S.C. 952(j). See 136 Cong. Rec. H9676 (Oct. 15, 1990) (statement of Rep. Weiss) ("Is not one of the problems also that whereas the Williams/Coleman [amendment] provides for the obscenity determination to be made by the courts, in the Regula amendment the determination would have to be made by NEA and that in itself would be unconstitutional, an abrogation of first amendment rights."); 136 Cong. Rec. H9411 (Oct. 11, 1990) (statement of Rep. Richardson) ("The legislation that we have in front of us says very clearly that the NEA may not fund obscenity and the determination of obscenity is left to the courts not politicians, not bureaucrats. But the courts, among juries of average people.")
 
 
 [14]
 The NEA refers to a 1989 statute that prohibits any person from knowingly using the telephone to make "any indecent communication for commercial purposes which is available to any person under 18 years of age or to any other person without that person's consent . . . ." 47 U.S.C. 223(b)(2)(A). The FCC defined "indecent communication" as "the description or depiction of sexual or excretory activities or organs in a patently offensive manner as measured by contemporary standards for the telephone medium." Information Providers' Coalition v. F.C.C., 928 F.2d 866, 874 (9th Cir. 1991) (holding regulation is not unconstitutionally vague)
 
 
 [15]
 When Congress enacted the "decency and respect" provision, it rejected a rival amendment, the Regula amendment. The Regula amendment would have required the NEA to Judge grant applications according to the decency standard articulated in F.C.C. v. Pacifica Found., 438 U.S. 726, 731-32, 57 L. Ed. 2d 1073, 98 S. Ct. 3026 (1978) - the same standard adopted by the FCC in the "dial-a-porn" context. See Information Providers' Coalition, 928 F.2d at 874 (noting that the FCC's definition of "indecent communication" was lifted from the broadcast regulation at issue in Pacifica)
 
 
 [16]
 136 Cong. Rec. H9680 (Oct. 15, 1990) (statement of Rep. Coleman) ("The Regula amendment is in fact imposing a standard created by the Supreme Court to protect children listening to the radio, and he is applying it to everyone, including adults, by his amendment. . . . Coming out over the airwaves is one thing. Going to a theater performance is another.")
 
 
 [17]
 Our Conclusion is not affected by Rust v. Sullivan, 500 U.S. 173, 114 L. Ed. 2d 233, 111 S. Ct. 1759 (1991) and Regan v. Taxation with Representation, 461 U.S. 540, 76 L. Ed. 2d 129, 103 S. Ct. 1997 (1983). Neither case involved a vagueness challenge. Moreover, in Bullfrog Films we held a duty exemption void for vagueness while recognizing the general principles announced in Regan. And, as we discuss more fully in Part II, Rust is of limited applicability in light of the reasoning of Rosenberger v. Rector & Visitors of the Univ. of Virginia, 132 L. Ed. 2d 700, 115 S. Ct. 2510 (1995), differentiating government programs that encourage private speech from government programs that use private speakers "to transmit specific information pertaining to [government] programs." 115 S. Ct. at 2519. The NEA is a quintessential example of a government program designed to encourage private speech, rather than one that seeks to use private individuals for a particular government purpose, such as the Dissent's example of commissioning an artist to create a bust of Lincoln for display in a public building
 
 
 [18]
 The Dissent suggests that it is untenable to find the "decency" and "respect" criteria impermissibly vague without also holding unconstitutional the statute's provision that "artistic excellence and artistic merit are the criteria by which applications are Judged." 20 U.S.C. 954(d)(1). The short answer is that appellants have challenged only the "decency" and "respect" criteria, and therefore only these criteria are before us. The application of the "void for vagueness" doctrine to the criteria of "artistic excellence and artistic merit" may present quite different considerations
 One obvious difference may be the extent to which the two sets of criteria implicate the policy concerns underlying the "void for vagueness" doctrine. See generally Bullfrog Films, 847 F.2d at 512 (vague laws are objectionable because they "trap the innocent by not providing fair warning," invite arbitrary and discriminatory enforcement, and discourage the exercise of constitutional rights). A second difference that may affect the outcome is the context in which the criteria are applied and the characteristics of the decision makers. Funding applications are reviewed by advisory panels composed of artists and "lay individuals who are knowledgeable about the arts." 20 U.S.C. 959(c)(2). Recommendations of the advisory panels are reviewed by the National Council of the Arts, which is composed of persons to be selected "from among the private citizens of the United States who (A) are widely recognized for their broad knowledge of, or expertise in, or for their profound interest in, the arts and (B) have established records of distinguished service, or achieved eminence, in the arts." 20 U.S.C. 955(b). Such decision makers possess an expertise in determining "artistic excellence and artistic merit" that will guide their application of these criteria; they have no corresponding expertise in applying such free-floating concepts as "decency" and "respect." As then-NEA Chairperson Frank Hodsoll testified, "I don't see any way for a Federal panel . . . expert in the arts, not expert in community standards . . . to make determinations for the entire Nation as to what is acceptable or what is not going to be patently offensive." Reauthorization of Foundation on the Arts and the Humanities Act of 1965, Joint Hearings Before the Subcomm. on Select Education & the Subcomm. on Post-secondary Education of the Comm. on Education and Labor, 99th Cong., 1st Sess. 552 (1985).
 
 
 [19]
 Art is protected by the First Amendment. As the Supreme Court noted in Miller v. California, "the First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value." 413 U.S. at 34
 
 
 [20]
 NEA contends the district court erred by extending Rust to the arts funding context, arguing the Rust exceptions are limited to "special places" and "special relationships." This argument is foreclosed by Rosenberger, which took a much broader view of the First Amendment's applicability to subsidized speech. See Rosenberger, 115 S. Ct. at 2517 (university's student activities fund, while not a traditional physical forum, was subject to First Amendment constraints)
 
 
 [21]
 NEA and the Dissent rely on two cases, Advocates for the Arts v. Thomson, 532 F.2d 792 (1st Cir. 1976), and Piarowski v. Illinois Community College Dist. 515, 759 F.2d 625 (7th Cir. 1985). Both cases are distinguishable. Moreover, both were decided before Rosenberger, and to the extent they conflict with this most recent teaching on viewpoint discrimination, are not persuasive
 
 
 [22]
 On similar grounds, NEA urges us not to reach plaintiffs' First Amendment claims. However, we disagree with NEA's assertion that the district court's First Amendment decision was "obviously premature" because it rested on assumptions about how the Chairperson would implement 954(d)(1)'s "decency and respect" provision. Under the interpretation originally proposed by NEA, the statute was implemented when the Chairperson, taking "decency and respect" into consideration, decided no changes in the application process were needed. We rejected this interpretation in Part I(A), supra, and NEA now argues we should avoid the First Amendment issues because "there is no way to predict what the Chairperson's new manner of implementing the statute would be." Plaintiffs bring a facial challenge, however. Although NEA is entitled to promulgate regulations interpreting the statute, we are not obligated to withhold judgment while the agency does so
 
 
 [23]
 Amici suggest Congress may have wished to avoid requiring taxpayers to fund work they found offensive. However, neither protecting people from offensive and indecent speech nor protecting the taxpayer from unwanted expenditures is a compelling interest sufficient to justify content-based restrictions on speech. See F.C.C. v. Pacifica Found., 438 U.S. 726, 745, 57 L. Ed. 2d 1073, 98 S. Ct. 3026 (1978) ("The fact that society may find speech offensive is not a sufficient reason for suppressing it."); Sable, 492 U.S. at 126 (First Amendment protects speech that is "indecent but not obscene"); F.C.C. v. League of Women Voters, 468 U.S. 364, 385 n.16, 82 L. Ed. 2d 278, 104 S. Ct. 3106 (1984) (taxpayers' opposition to expenditure of government funds cannot "be invoked to justify a congressional decision to suppress speech")
 
 
 [24]
 The district court concluded 954(d)(1) was unconstitutionally overbroad because it was a content-based restriction that "swept within its ambit speech and artistic expression which is protected by the First Amendment." Finley, 795 F. Supp. at 1476. Although we frame our Discussion in terms of strict scrutiny, we agree with the district court's Conclusion
 
 
 [1]
 (c) Program of contracts, grants-in-aid, or loans to groups and individuals for projects and productions; traditionally underrepresented recipients of financial assistance. The Chairperson, with advice of the National Council on the Arts, is authorized to establish and carry out a program of contracts with, or grants-in-aid or loans to, groups or, in appropriate cases, individuals of exceptional talent engaged in or concerned with the arts, for the purpose of enabling them to provide or support -
 (1) projects and productions which have substantial national or international artistic and cultural significance, giving emphasis to American creativity and cultural diversity and to the maintenance and encouragement of professional excellence;
 (2) projects [and] productions, meeting professional standards or standards of authenticity or tradition, irrespective of origin, which are of significant merit and which, without such assistance, would otherwise be unavailable to our citizens for geographical or economic reasons;
 (3) projects [and] productions that will encourage and assist artists and enable them to achieve wider distribution of their works, to work in residence at an educational or cultural institution, or standards of professional excellence;
 (4) projects and productions which have substantial artistic and cultural significance and that reach, or reflect the culture of, a minority, inner city, rural, or tribal community;
 (5) projects and productions that will encourage public knowledge, education, understanding, and appreciation of the arts;
 (6) workshops that will encourage and develop the appreciation and enjoyment of the arts by our citizens;
 (7) programs for the arts at the local level;
 (8) programs that enhance managerial and organizational skills and capacities;
 (9) projects, productions, and workshops of the kinds described in paragraphs (1) through (8) through film, radio, video, and similar media, for the purposes of broadening public access to the arts; and,
 (10) other relevant projects, including surveys, research, planning, and publications relating to the purposes of this subsection.
 . . . .
 (d) Application for payment; regulations and procedures. No payment shall be made under this section except upon application therefor which is submitted to the National Endowment for the Arts in accordance with the regulations and procedures established by the Chairperson. In establishing such regulations and procedures, the Chairperson shall ensure that -
 (1) artistic excellence and artistic merit are the criteria by which applications are Judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public ; and
 (2) applications are consistent with the purpose of this section. Such regulations and procedures shall clearly indicate that obscenity is without artistic merit, is not protected speech, and shall not be funded. Projects, productions, workshops, and programs that are determined to be obscene are prohibited from receiving financial assistance under this Act from the National Endowment for the Arts. The disapproval or approval of an application by the Chairperson shall not be construed to mean, and shall not be considered as evidence that, the projects, production, workshop, or program for which the applicant requested financial assistance is or is not obscene.
 20 U.S.C. 954(d) (emphasis added). The 1990 amendment added the emphasized language to 20 U.S.C. 954(d).